# United States Court of Appeals
## For the First Circuit

No. 10-1607

DENISE M. BARRY; ELIZABETH H. GOLDEN; PATRICIA J. MCDONOUGH;
ELAINE MESITI; LILA BROWN; MARY M. KANE; and JUDITH A. KELLEY;

Plaintiffs, Appellants,

v.

ROBERT J. MORAN; PAUL A. CHRISTIAN; WILLIAM KESSLER; WILLIAM
HITCHCOCK; RONALD KEATING; RODERICK FRASER; JOSEPH FINN; JOHN DOE
and/or JANE DOES 1-50; and CITY OF BOSTON FIRE DEPARTMENT,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Boudin, and Lipez, Circuit Judges.

Thomas F. Feeney, with whom Feeney & Associates at Law were on
brief, for appellants.
Dawn M. Beauchesne, Assistant Corporation Counsel, with whom
Ian D. Prior was on brief, for appellees.

November 22, 2011

**LIPEZ**, **Circuit Judge**. In this civil rights suit, appellants allege that a pattern of cronyism and nepotism in the employment decisions of the Boston Fire Department ("BFD" or "Department") rose to the level of actionable political discrimination in violation of the First Amendment. Appellants Denise Barry, Elizabeth Golden, Patricia McDonough, Elaine Mesiti, Lila Brown, Mary Kane and Judith Kelley are civilian employees of the BFD. Along with another employee,[1] they filed suit in Massachusetts state court alleging that certain employment actions affecting their status with the BFD were unconstitutional, tortious, and retaliatory. Specifically, they alleged that, because they chose not to associate politically with a powerful group of individuals at the BFD and in the government of the City of Boston, they were passed over for promotions and other public benefits that they otherwise would have received.

The appellees, defendants below, include the BFD[2] and numerous BFD supervisors and former supervisors. After removing the case to federal court, the appellees moved for summary judgment, arguing that no evidence linked the challenged employment

---

[1] Jane Green, a plaintiff below, entered into a settlement agreement with the defendants and is not a party to this appeal.

[2] The BFD, as a department of the City of Boston, is not an entity subject to suit under Section 1983. See Dwan v. City of Boston, 329 F.3d 275, 278 n.1 (1st Cir. 2003). The plaintiffs' second and third Amended Complaints properly name the City of Boston as defendant in place of the BFD.

-2-

decisions to an identifiable political group, cause, or belief. Without elaboration, the district court granted the motion as to the appellants' federal claims, brought under 42 U.S.C. § 1983, and remanded the state law claims to the Massachusetts state court.

We affirm. The First Amendment's prohibition of political discrimination is a component of its general protection of the rights of freedom of speech and association. Elrod v. Burns, 427 U.S. 347, 356-57 (1976). Yet not all speech and association falls within the ambit of the First Amendment. A successful claim that a public employer violated First Amendment rights through adverse employment decisions motivated by a plaintiff's associational choices requires some evidence that the association at issue is political or otherwise constitutionally protected. The record in this case reveals insufficient evidence of this sort to create a triable issue of fact. However unsavory it may be, preferential treatment in public employment decisions unrelated to protected speech or association does not infringe upon freedoms secured by the First Amendment.

**I.**

**A. Factual Background**

We recount the facts in the light most favorable to the appellants, the party opposing summary judgment.[3] Agusty-Reyes v.

---

[3] The record in this case leaves much to be desired. Not only did appellants fail to comply with Federal Rule of Appellate Procedure 30(d) by failing to paginate appellees' exhibits in the

-3-

Dep't of Educ. of P.R., 601 F.3d 45, 48 (1st Cir. 2010). The seven plaintiffs are long-time civilian employees of the BFD, who, at the time that this suit was filed, had between eight and 39 years of experience with the Department. The defendants are high-ranking officials or former officials within the BFD and the City of Boston. At the time the motions for summary judgment were filed, the defendants held the following positions: Deputy Chief (Finn and Hitchcock), Chief (Keating), Director of Human Resources ("HR") for the BFD (Moran), Commissioner and former Commissioner of the BFD (Fraser and Christian, respectively), and Assistant Director of HR for the City of Boston (Kessler). The defendant most involved in the plaintiffs' allegations is Moran. In his role as Director of HR for the BFD, he performed a preliminary screening of applicants for civil positions, conducted initial interviews and forwarded top candidates to the Commissioner. Final authority for all personnel decisions, including hiring, firing and promotion, rested with the Commissioner of the BFD, a position held by defendant Christian

appendix, but they also failed to comply with district court rules intended to ease the court's review of factually complex cases on motions for summary judgment. See D. Mass. L.R. 56.1. Much of the appellants' Rule 56.1 Statement is merely a verbatim recitation of allegations made in the complaint, as are their responses to certain interrogatories. Thus the appellants have failed to fulfill their obligation to organize the record and direct the court to the materials necessary to evaluate their claims. See Taylor v. Am. Chemistry Council, 576 F.3d 16, 32 n.16 (1st Cir. 2009) ("It is not the court's responsibility to 'ferret out and articulate' the record evidence material to the appellants' claims."). Nevertheless, we have looked to the record to determine whether triable issues of fact exist in this case.

-4-

from November 2001 to February 2006, and subsequently by defendant Fraser.

There is no single incident or actor to which all the plaintiffs point as the basis for their claims.[4]  Rather, they allege a pattern of discrimination on the basis of political affiliation going back to at least 2000,[5] which was evident in myriad ways with respect to each plaintiff.  That said, there are important commonalities among the factual circumstances underlying the plaintiffs' claims.

All of the plaintiffs held administrative positions in the BFD, serving as clerk typists or administrative assistants.  To varying degrees, each of the plaintiffs moved up within the Department over the course of their employment, receiving additional pay, responsibilities, and new job titles. However, for each plaintiff, promotions within the Department slowed or ceased

---

[4] The plaintiffs originally sought to bring their claims as a class action on behalf of all employees of the BFD who had suffered similar treatment, but the motion for class certification was denied.  In doing so, the district court adopted the recommendation of a magistrate judge, who explained that "the record reveals an assortment of highly individualized employment decisions involving individual plaintiffs having different backgrounds and employment experience and seeking a diverse array of employment positions." Barry v. Moran, No. 05-10528 (D. Mass. Apr. 7, 2008) (Report and Recommendation).

[5] Although the plaintiffs claim damages for events that occurred from 2000 onward, they point to events predating that period as evidence of a pattern and practice within the BFD, which they argue helps to establish an impermissible motive for the challenged employment decisions.

at a certain point, and each was repeatedly denied or dissuaded from applying for promotions, step increases or transfers, despite the fact that they were qualified for the positions they sought.

For example, one of the plaintiffs, Denise Barry, identified eleven BFD positions that she applied for between 2000 and 2006, none of which she received. Another plaintiff, Patricia McDonough, submitted seven unsuccessful applications between 1999 and 2004 for positions within the BFD. Yet another plaintiff, Lila Brown, identified nine positions within the BFD that she unsuccessfully applied for between 1999 and 2000. In the case of each of the plaintiffs, the positions for which they applied represented desirable promotions or transfers that would have brought them added responsibilities, higher salaries and/or opportunities for advancement within the BFD.

While the circumstances surrounding each of the challenged employment decisions differ, certain trends emerge. First, equally-qualified applicants from within the BFD were often passed over in favor of individuals from outside the BFD, contrary to a policy of preference for in-house candidates. Second, individuals were hired who lacked requisite qualifications for the jobs for which they were hired, and in some cases job descriptions and minimum qualifications were altered to aid particular candidates. Third, hiring was occasionally completed without the public posting of jobs as required by BFD and union rules.

Finally, the candidates who benefitted from these practices were often friends, neighbors or relatives of influential BFD employees, powerful people within city government or elected officials. As one plaintiff testified in her deposition, "persons were appointed to positions in the Boston Fire Department because of who they knew, who sponsored them, and who supported them, rather than merit."

Thus, the plaintiffs are individuals who were passed over or denied jobs and promotions in favor of others who had a connection to those in power in the BFD or city government. During this time, power in the BFD was largely located in two informal groups that the plaintiffs identify as the "Hyde Park Group" and the "South Boston Group." Although one need not be a resident of one of these two Boston locales to be affiliated with the group, each group was loosely organized around certain powerful people who lived in those locales. The "Hyde Park Group" is alleged to have especially benefitted from its connections to Boston Mayor Thomas M. Menino, who was a resident of the neighborhood. Many, if not most, of the successful applicants for positions within the BFD during this time enjoyed the benefit of the familial, social and professional connections that linked members of these two neighborhood-based groups.

For example, the plaintiffs identify a position that five of them would have applied for in 2003 if they had not been

discouraged from doing so.  The person who was hired for the job was already a BFD employee, and was dating someone who worked in a City Councilor's office.  She also happened to be related to one of the defendants.  Notably, the successful applicant had been among those who conducted the first round of interviews for the position, and, after it was determined that she would receive the position, the job grade was raised to match her level.  Independent of this particular incident, she also received benefits in the form of paid vacation and free tuition for continuing education classes that were not available to the plaintiffs.

Similarly, in late 2003, plaintiff Barry inquired about a permanent assignment to a position she had been temporarily filling while it was vacant.  Despite the fact that she had performed the job satisfactorily, she was told that someone from City Hall would be taking the position, although this person never materialized.  Ultimately, the position went to a former BFD employee who was living out of state at the time, but who had close connections to two chiefs of the BFD and was a "great friend" of another influential person in the Department.  When Barry complained that she did not receive the position, and observed that many of those who had been hired by the BFD had some pre-existing relationship with influential BFD and city officials, defendant Moran allegedly replied "[w]ell, if you're not into politics, little girl, then you're not into a position here."  All told,

plaintiffs identify dozens of positions that were filled by relatives, neighbors and friends of high-ranking officials within the BFD and Boston city government.

The conduct alleged by plaintiffs is not unprecedented in the BFD. A January 2000 report issued by the Boston Fire Department Review Commission noted that "a significant number" of respondents to a department-wide survey "complained of the 'old boy network' in place throughout the department."[6] The report went on to state that "[t]here exists a strong perception that if you are not among the 'in' crowd, you will not succeed, you will not receive better assignments, you will not be encouraged to take a leadership role and you will not be taken seriously regarding suggestions for improvement." While these observations were made in regard to efforts to improve racial and gender diversity within the BFD, they are also consistent with the allegations raised by plaintiffs in this case.

---

[6] This report, titled "The Challenge: Managing Tradition, Diversity and Change," was prepared by the Boston Fire Department Review Commission. Mayor Menino appointed this body to address various administrative issues in the BFD, including problems with training, discipline, and integration of women and racial and ethnic minorities. The appellees offered the report to illustrate the efforts that the BFD has taken to be a more inclusive and professionally managed organization. In particular, the appellees point to the report's recommendation of a merit-based hiring system and argue that, in expecting to benefit from seniority and the fact that they were in-house applicants, the appellants represent the old, discredited system and are opposed to positive change.

Additionally, in October 2000, Mayor Menino issued an executive order stating that "discrimination, retaliation and harassment are contrary to City policy and are also illegal. Such conduct is defined as follows: . . . Conduct that conditions a person's hiring, compensation, terms and conditions of employment or access to services provided by the City on that person's . . . political affiliation." According to plaintiffs, this executive order was intended to address "a historical pattern and practice of political affiliation discrimination, a.k.a. 'patronage' or 'cronyism,' within Boston City departments, including but not limited to Defendant Boston Fire Department."

## B. Procedural Background

On March 14, 2005, plaintiffs filed a complaint in Suffolk Superior Court raising numerous claims under federal and Massachusetts state law, including claims under 42 U.S.C. § 1983 alleging a violation of their First Amendment right to be free of discrimination on the basis of political affiliation. The complaint sought injunctive relief, declaratory relief and damages against the various defendants. In turn, the defendants removed the case to federal court. Subsequently, the plaintiffs filed two amended complaints adding additional plaintiffs and allegations.[7]

---

[7] In contrast to their Third Amended Complaint, which only alleges a violation of First Amendment rights, the plaintiffs' brief on appeal states summarily that their Section 1983 claim alleges violations of the First, Fifth, Ninth and Fourteenth Amendments. However, their brief and their statements at oral

The defendants moved for summary judgment.  With the exception of one plaintiff (whose claims were later settled), the district court granted the motions on the Section 1983 claims and remanded the state law claims to Massachusetts state court.  There was no oral argument on the summary judgment motions,[8] and the district court did not explain its reasoning.[9]

## II.

We review the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the non-

---

argument focus exclusively on their First Amendment political discrimination argument and never explain the basis for claims alleging violations of other rights secured by federal law. Accordingly, we address only the First Amendment political discrimination argument.

[8] A hearing was scheduled with the expectation of oral argument on the summary judgment motions, but the plaintiffs' attorney failed to appear.

[9] Appellants argue that it was legal error for the district court to fail to explain its summary judgment order.  They ask us to remand for that explanation.  We may quickly dispose of this argument.  Federal Rule of Civil Procedure 52(a) explicitly states that district courts are "not required to state findings or conclusions when ruling on a motion under Rule 12 or 56."  Fed. R. Civ. P. 52(a)(3); see also Zayas v. Bacardi Corp., 524 F.3d 65, 70 (1st Cir. 2008) ("Though a district court ordinarily ought to explain the reasoning behind a grant of summary judgment, it is not obliged to do so."); Grossman v. Berman, 241 F.3d 65, 68 (1st Cir. 2001) ("[A] trial court, on a motion for summary judgment, has no absolute obligation either to make specific findings of fact or to elaborate upon its view of the controlling legal principles.").  In some cases we have remanded for an explanation of the district court's reasoning where necessary to evaluate the decision.  See Grossman, 241 F.3d at 68-69 (remanding for elaboration where the bankruptcy court's "enigmatic explanation" and the district court's "terse affirmance" "supplie[d] insufficient guidance for reasoned review").  We see no need to do so here.

-11-

moving party. Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 446 (1st Cir. 2009). Summary judgment is appropriate where the moving party shows that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Although we give the non-moving party the benefit of all reasonable inferences, a party cannot rest on 'conclusory allegations, improbable inferences, or unsupported speculation' to defeat a motion for summary judgment." Welch v. Ciampa, 542 F.3d 927, 935 (1st Cir. 2008) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)). Rather, "[t]o defeat a motion for summary judgment, the nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Appellants insist that they have set forth facts in the summary judgment record creating genuine issues for trial.

## A. Legal Principles

It is well-established that "non-policymaking public employees are protected from adverse employment decisions based on their political affiliation." Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000) (reviewing the Supreme Court's decisions in Rutan v. Republican Party of Ill., 497 U.S. 62 (1990); Branti v. Finkel, 445 U.S. 507 (1980); and Elrod v. Burns, 427 U.S. 347 (1976)). As the Court explained in Elrod, "political belief and association constitute the core of those activities

-12-

protected by the First Amendment. . . . [And], if there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics . . . ." 427 U.S. at 356 (internal quotation mark omitted).

Traditional political patronage systems reward support for the political party in power with jobs or other public benefits, thereby placing undue pressure on public employees and job applicants to conform their political beliefs and conduct accordingly.[10] Thus, "[t]he cost of the practice of patronage is the restraint it places on freedoms of belief and association." Id. at 355. For those holding government jobs, the ever-present "threat of dismissal for failure to provide that support unquestionably inhibits protected belief and association." Id. at 359. Similarly, for those seeking governmental employment, promotion or transfer, the effect of requiring association or support for a particular party, candidate or cause impermissibly

_____

[10] Of course, this concern applies only to government employees in non-policymaking positions. In Branti, the Court explained that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." 445 U.S. at 517; see also Padilla-Garcia, 212 F.3d at 74 n.2 ("[P]olicymaking and confidential employees might justifiably be dismissed on the basis of their political views."). However, none of the appellants allege that they held, or sought to be appointed to, policymaking or confidential positions.

-13-

impinges upon the freedoms of belief and association. See Rutan, 497 U.S. at 79.

Claims of political discrimination in public employment are evaluated under a two-part test established by the Court in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977). Under this test, the plaintiff must first show that "his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' [in the adverse employment action]." 429 U.S. at 287. If this showing is made, the defendant has the opportunity to show "by a preponderance of the evidence that it would have reached the same decision as to . . . [the adverse employment action] even in the absence of the protected conduct." Id.; see also Padilla-Garcia, 212 F.3d at 74-78 (applying Mt. Healthy test).

In evaluating claims of political discrimination, the Court has been clear that constitutional protection extends to the decision not to associate with a political party or faction. See Rutan, 497 U.S. at 76 ("The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate." (emphasis added)); Welch, 542 F.3d at 939 ("The freedom not to support a candidate or cause is integral to the freedom of

-14-

association and freedom of political expression that are protected by the First Amendment."). Thus, "coercion [of belief] is equally unlawful when it is directed toward apolitical career employees as when it is directed towards a party's political opponents." Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97, 101-02 (1st Cir. 1997).

However, in order to meet the first prong of the Mt. Healthy test and receive First Amendment protection, the association, or refusal to associate, must be political in nature or implicate some other constitutional concern. As the Supreme Court has explained, "the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" Garcetti v. Ceballos, 547 U.S. 410, 420 (2006) (quoting Connick v. Myers, 461 U.S. 138, 154 (1983)). Similarly, we have noted that "the first amendment does not protect against all deprivations arising out of an act of association unless the act itself - say, joining a church or a political party, speaking out on matters of public interest, advocacy of reform - falls within the scope of activities eligible for inclusion within the constitutional tent." Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 57 (1st Cir. 1990), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61 (1st Cir. 2004). Thus, mere personal association without political overtones does not implicate First Amendment concerns, and "the

-15-

burden of proof [is] on the plaintiff to demonstrate that her association was political and not personal." Padilla-Garcia, 212 F.3d at 76.

Without purporting to be exhaustive, the term "political," in the relevant First Amendment sense, pertains to the conduct of government, public policy or public controversies. See Padilla-Garcia, 212 F.3d at 76 (noting that support for a political candidate - in a campaign or as member of an administration - is an archetypal political association); LaRou, 98 F.3d at 662 (finding that there was no protected activity, where plaintiff was not motivated by campaign plans, affiliation with a particular candidate, or beliefs animating a disputed election); Correa-Martinez, 903 F.2d at 57 (noting that plaintiff must allege discrimination on the basis of "ideology" or "partisan affiliation"); Black's Law Dictionary 1276 (9th ed. 2009) (defining "political" as "[p]ertaining to politics; or relating to the conduct of government"). Given this understanding of the term "political," "[s]upport for a political candidate . . . is an example of an association that inevitably implicates the right to engage in association for the advancement of beliefs and ideas." Padilla-Garcia, 212 F.3d at 76 (internal quotation marks omitted). Nevertheless, the label "political" does not necessarily implicate partisan politics and traditional political parties. See id. (noting that "factions within one party can represent different

political philosophies," and association with one faction in opposition to another is subject to First Amendment protection).

There is no mechanical test for determining whether the association at issue is sufficiently political to trigger constitutional protection. "[W]e have held, time and again, that circumstantial evidence alone can support a finding of political discrimination." Anthony v. Sundlun, 952 F.2d 603, 605 (1st Cir. 1991). We have previously observed that a "highly-charged political atmosphere" accompanying a shift of power from one political party to another, along with the fact that the plaintiffs and defendants are of competing political persuasions, may be probative of discriminatory animus. Acevedo-Diaz v. Aponte, 1 F.3d 62, 69 (1st Cir. 1993). Additionally, the fact that a plaintiff was actively involved in electoral politics in a prominent public role can help establish a political motive for an adverse employment action. Id. Our cases contain many other examples of evidence indicative of the political motivation for challenged employment actions. See, e.g., Welch, 542 F.3d at 940-41 (noting that after remaining neutral in a political controversy the plaintiff was replaced by a vocal supporter of new police chief); Acosta-Orozco, 132 F.3d at 102 (finding that failure to afford plaintiffs a hearing to contest adverse employment action could fairly imply that the stated apolitical reason for the action was pretextual); Acevedo-Diaz, 1 F.3d at 70 n.6 (noting that plaintiff

was constructively dismissed one day after the new administration took office).

Thus, a plaintiff alleging discrimination on the basis of political affiliation may escape summary judgment only by

> pointing to evidence in the record which, if credited, would permit a rational fact finder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus. Without more, a nonmoving plaintiff-employee's unsupported and speculative assertions regarding political discrimination will not be enough to survive summary judgment.

LaRou, 98 F.3d at 661 (quoting Rivera-Cotto v. Rivera, 38 F.3d 611, 614 (1st Cir. 1994)); see also Kauffman v. P.R. Tel. Co., 841 F.2d 1169, 1173 n.5 (1st Cir. 1988) (noting in the context of a political discrimination claim that "the party against whom summary judgment is sought must generate the specific facts necessary to take the asserted claim out of the realm of speculative, general allegations" (emphasis added)). With these legal requirements in mind, we turn to appellants' claims of political discrimination.

**B.  Appellants' Use of the Label "Political"**

On its face, appellants' claim that they were penalized for their lack of political support for, or association with, those in power in the BFD and Boston city government would seem to fall within the scope of the First Amendment's protection. However, a review of the record reveals that the associations identified by appellants as the basis for the challenged employment decisions are

personal, not political, in nature. While appellants consistently apply the label "political" to the decision-making process that resulted in the challenged adverse employment actions, they use this adjective to refer to office politics and interpersonal relationships rather than the conduct of government, public policy or public controversies. In appellants' parlance, any connection to a city official or powerful figure within the BFD is a political connection or affiliation. For example, appellants assert that a friendship with the mayor's wife, dating someone who works in a city councilor's office, being the son-in-law of the mayor's right-hand-man, and living on the same block as a BFD chief are all "political" connections.

Notably, appellants do not allege, for example, that they are members of a rival political party, that a divisive political issue created a rift between appellees and themselves, or that they were asked for campaign contributions or to engage in other political activity. Furthermore, despite references in interrogatory responses to political power struggles within the BFD, none of the appellants offer evidence of power struggles concerning the conduct of government, public policy or public controversies.

In fact, multiple appellants acknowledged in deposition testimony that, despite the label "political," the associations and connections they complain of are personal in nature. Barry stated

that "[t]here's always political cliques in any agency . . . . It's just whoever is the administration head at that time, usually has their little, you know, circle that they make sure that they take care of their friends." Similarly, Kane noted that another BFD employee was hired because she was the recent widow of a firefighter and the department wanted to "help her out." Kane viewed this as an example of political affiliation discrimination, but said that she did not object to it because it was for a good cause.

Most tellingly, McDonough explained that "<u>our parties aren't politically affiliated. You're affiliated through who you know</u>, so it doesn't mean that your political affiliation is saying that you're in the Democratic Party or the Republican party. It's saying that you're affiliated through who you know." Later in the same deposition, McDonough explained how one comes to be affiliated with the neighborhood-based factions that all of the appellants identified within the BFD and the City of Boston:

Q: Are you saying that everyone in Hyde Park is
   politically connected to Mayor Menino?
A: No.
Q: Are you saying that you have to live in Hyde Park in
   order to be politically connected to the Hyde Park
   Group?
A: No.
Q: So what are you saying?
A: <u>You just have to know them and be -- whether you're
   a relative or a friend or.</u>
Q: That would apply to the South Boston Group as well?
A: Yes.

Accordingly, McDonough's use of the term political affiliation is properly understood to refer to friendships and familial relationships with influential people, a usage that is common to all of the appellants.

**C. The Challenged Hiring and Promotion Decisions**

Consistent with their broad understanding of "political affiliation," appellants offer no evidence that the employment decisions of which they complain were motivated by the relevant sort of political animus. Conspicuously absent from the record is any evidence of a pattern of hiring or promotion in the BFD on the basis of association with a particular candidate or cause concerning government, public policy or public controversies. Of the dozens of individuals identified by the seven appellants as having been hired or promoted on the basis of a political affiliation, there is only one for which there is any record evidence suggesting that her relationship with those in power had some political element, in the relevant sense, and was not merely personal.

Mary Ann McHugo was hired as a Principal Administrative Assistant in 2000.[11] Prior to joining the BFD, McHugo had been an Assistant City Auditor and office manager in the Mayor's Office of Neighborhood Services. McHugo was active in numerous civic

_____

[11] McHugo is not a party to this lawsuit and she is mentioned by appellants only to provide contrast with their own lack of success in securing new positions and promotions within the BFD.

-21-

associations and met Mayor Menino several times before beginning her work with the City. Mayor Menino knew her father and attended his wake, and, most importantly, McHugo organized a rally for Mayor Menino at a neighborhood church. Accordingly, McHugo can be characterized as having both personal and political associations with Mayor Menino and his administration. However, this is the only political association identified by appellants among those associations cited as evidence of a pattern of political discrimination within the BFD. The presence of a single political association among dozens of personal associations does not create a material issue of fact as to whether their political neutrality -- rather than their lack of personal connections -- was the reason they were passed over for promotions and other employment benefits.[12]

Then there is Barry's statement that defendant Moran told her that "if you're not into politics little girl, then you're not into a position here." Interpreted in the context of the other evidence in the record, this statement can only refer to politics in the sense of office politics or personal connections. Nowhere does Barry allege that she was asked to take part in any political

---

[12] Although appellants' motion for class certification was denied, they do not clearly distinguish evidence in the record relevant to each appellant. Instead, their brief on appeal suggests that there exists a pattern and practice of political discrimination in the BFD and that, insofar as it establishes this pattern, all of the evidence they identify is relevant to each of the appellants' claims.

activity and refused, or that there was some public controversy in which she opposed those in power or remained neutral.  Barry alleges that the person who was hired for the position she sought, Ian McKenzie, was "politically affiliated with those with power and influence over the BFD."  However, she does not explain the nature of that affiliation or the basis for her conclusion that it was political.  There is no record evidence that McKenzie was engaged in any sort of political activity or had a political association with the administration.

There is some temptation to classify Moran's alleged statement as a "stray remark" of the sort we have identified in previous workplace discrimination cases.  A "stray remark" is a statement that, while on its face appears to suggest bias, is not temporally or causally connected to the challenged employment decision and thus not probative of discriminatory animus.  See Meléndez v. Autogermana, Inc., 622 F.3d 46, 54-55 (1st Cir. 2010). "[S]tray workplace remarks . . . normally are insufficient, standing alone, to establish . . . the requisite discriminatory animus." Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) (internal quotation marks omitted).  However, in this case, Moran's remark is closely connected to one of the challenged employment decisions.  Thus, the issue here is not that the statement is attenuated from the decision, but rather that, interpreted in the context of all the record evidence before us, the statement is not

sufficiently suggestive of animus based on political affiliation for the Section 1983 claim to survive summary judgment. See Goldman v. First Nat. Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) ("There is no trialworthy issue unless there is enough competent evidence to enable a finding favorable to the nonmoving party." (citing Anderson, 477 U.S. at 249)).

**III.**

Taken as a whole, the record before us lacks indicia of discrimination on the basis of political affiliation. There is no evidence, or even any allegation, of conflict concerning the conduct of government, public policy or public controversies. Likewise, there is no identification of any political group, party or faction with whom appellants associated, or refused to associate. The "South Boston Group" and the "Hyde Park Group" identified by appellants are at most social and familial networks loosely organized around Boston locales; there is no indication that they have any political significance.

We have previously explained that an employment decision motivated by cronyism, not discrimination, would be "lawful, though perhaps unsavory." Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 587 (1st Cir. 1999), abrogated on other grounds by Desert Palace v. Costa, 539 U.S. 90 (2003); see also Foster v. Dalton, 71 F.3d 52, 54, 56 (1st Cir. 1995) (stating in "a near-classic case of an old boy network in operation" that "Title VII does not outlaw

cronyism"). Other circuits have taken the same approach. The Tenth Circuit has noted that "[t]he friendship and nepotism cases only illustrate a broader principle: that employers are free to employ nondiscriminatory criteria that are 'unfair' or even reprehensible, so long as they are not discriminatory." Neal v. Roche, 349 F.3d 1246, 1252 (10th Cir. 2003). In particularly vivid language, the Second Circuit has observed that "back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, [and] spite" are not illegal motivations for employment decisions. Stratton v. Dep't for the Aging for City of New York, 132 F.3d 869, 880 (2d Cir. 1997) (internal quotation marks omitted).

Unfortunately for appellants, the simple fact that one is a friend or relative of a powerful person does not create a political association implicating First Amendment concerns. There is an important distinction between a public official who chooses to hire friends, relatives, neighbors or college buddies, and one who refuses to hire those who failed to make campaign contributions, join her political party or attend political rallies. Although the first public official may be practicing bad policy, she is not practicing political affiliation discrimination that violates First Amendment rights.[13] To ignore this distinction

---

[13] Because we find that there is insufficient evidence in the summary judgment record to create a triable issue of fact as to whether the appellants suffered adverse employment actions on the basis of political association, or lack thereof, there is no need to address the second part of the Mt. Healthy analysis asking

is to "constitutionalize the employee grievance" generally. Garcetti, 547 U.S. at 420. We have no authority or inclination to take that step.

Affirmed.

---

whether the adverse employment action would have been taken regardless of the association in question.