# United States Court of Appeals
## For the First Circuit

No. 10-2248

MYRTA TORRES-SANTIAGO; MIGDALIA RODRÍGUEZ-RIVERA;
JOSÉ RIVERA-DEL VALLE,

Plaintiffs, Appellants,

v.

MUNICIPALITY OF ADJUNTAS; JAIME H. BARLUCEA-MALDONADO, in his
official capacity as Mayor of the Municipality of Adjuntas,

Defendants, Appellees,

WALVER BÁEZ-LUGO, in his personal and official capacity; DANIEL
PORTELA, in his personal and official capacity; HERNÁN CARABALLO,
in his personal and official capacity; CLARIBEL PAGÁN, in her
personal and official capacity; JOHN DOE; RICHARD DOE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

José Martinez Custodio for appellants.
Luis R. Pérez Giusti, with whom Adsuar Muñiz Goyco Seda &
Pérez-Ochoa, P.S.C. was on brief, for appellees.

September 7, 2012

**LIPEZ, Circuit Judge**.  This appeal involves an award of $59,787.50 in attorney's fees against unsuccessful plaintiffs in a civil rights action.  Plaintiffs Myrta Torres-Santiago, Migdalia Rodríguez-Rivera, and José Rivera-del Valle argue that their lawsuit was not so frivolous or unreasonable as to justify an award of fees to the defendants.  We agree, except for Torres's inferior working conditions claim against Walver Báez-Lugo and Rivera's claims against Hernán Caraballo.  There was no reasonable basis for those claims.  Hence, we vacate the fee award and remand for further proceedings relating to any attorney's fees incurred by the Municipality of Adjuntas in relation to those claims only.

## I.

Plaintiffs brought suit pursuant to 42 U.S.C. § 1983 and Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit 31, § 5141, alleging that the Municipality of Adjuntas (the "municipality") and its Mayor, Jaime H. Barlucea-Maldonado (the "Mayor"), engaged in unlawful political discrimination in violation of the U.S. Constitution and the laws and Constitution of the Commonwealth of Puerto Rico.  In making these claims, the complaint also named as defendants the plaintiffs' direct supervisors, Walver Báez-Lugo, Daniel Portela, and Hernán Caraballo (together, the "supervisory defendants") in their individual capacities, as well as the Mayor in his individual capacity.  The complaint included due process and equal protection claims pursuant to the Fifth and

-2-

Fourteenth Amendments to the Constitution. The plaintiffs sought compensatory and punitive damages and declaratory and injunctive relief.

The Mayor and supervisory defendants successfully moved, in their individual capacities, to dismiss plaintiffs' due process and equal protection claims. The municipality, the Mayor in his official and personal capacities, and the supervisory defendants in their personal capacities then filed a motion for summary judgment on the remaining claims. The motion was granted in favor of the supervisory defendants and denied as to the municipality and Mayor. On the eve of trial - more than a year after the plaintiffs first submitted a settlement demand - the municipality and Mayor made a settlement offer and engaged in negotiations.[1] Settlement negotiations were unsuccessful, and the parties proceeded to trial on January 19, 2010. On January 27, 2010, the jury returned a verdict in favor of the municipality and Mayor.

On March 17, 2010, the municipality filed a motion for $63,687.50 in attorney's fees pursuant to 42 U.S.C. § 1988(b), arguing that it was entitled to fees because the "[p]laintiffs engaged in a totally unfounded, frivolous and reiterated [sic]

_____

[1] At oral argument, plaintiffs represented that they received the settlement offer from the municipality and Mayor on January 19, 2010, the first day of trial. The municipality and Mayor stated that they presented the offer approximately one week before the start of trial, but the court only became aware of and involved in the settlement negotiations on January 19. The difference is immaterial to our analysis.

attempt to charge [d]efendants with political discrimination allegations." The supervisory defendants did not seek attorney's fees.

On September 7, 2010, the district court granted the motion in part. In a written decision, the district court began its analysis by listing "some important factors" that the Eleventh Circuit has identified for consideration when making the case-by-case determination about whether a plaintiff's claim is frivolous: "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." (quoting Sullivan v. Sch. Bd., 773 F.2d 1182, 1189 (11th Cir. 1985)). Applying this law, the district court wrote the following:

> [The municipality and Mayor] allege that the court should award them attorney['s] fees because Plaintiffs were aware that their claims against [Báez, Portela, and Caraballo] lacked merit. Yet, the Plaintiffs pursued their actions against these [supervisory] co-defendants[,] thus multiplying the costs of litigation. The Court agrees. After reviewing the evidence submitted at the motion for summary judgment stage, the Court found that the Plaintiffs were unable to establish a prima facie case against [the supervisory defendants] because Báez belonged to the same political party as Plaintiffs and because Plaintiffs were unable to establish any involvement on the part of Portela and/or Caraballo with respect to the alleged adverse employment actions complained of.

With regard to the municipality and Mayor, the district court recognized that the Sullivan factors indicated that the plaintiffs' claims were not frivolous or unreasonable:

> Applying the Sullivan factors enumerated above, we would be forced to conclude that the Plaintiffs' action against Barlucea and the Municipality [was] not frivolous inasmuch as they were able to establish a prima facie case at the summary judgment stage, the [municipality and Mayor] offered settlement and a full-blown trial on the merits was seen as to these two co-defendants.

Nevertheless, the court noted contrary authority that supported a different outcome:

> "[C]ases that are ultimately viewed as frivolous may well survive motions to dismiss under a system of notice pleading that does not require factual detail and even motions for summary judgment in which the evidence may be presented in sketchy fashion and credibility may not be taken into account." Greenberg v. Hilton Intern. Co., 870 F.2d 926, 940 (2d Cir. 1989). The Court first notes that the only reasons the Plaintiffs survived summary judgment were that, pursuant to the applicable standard, the Court could not make credibility determinations and the evidence had to be examined in the light most favorable to the Plaintiffs. The Plaintiffs must have known that they would not be afforded such indulgence at trial and to the extent they refused to accept a sound settlement offer prior to the commencement of the jury trial, the Court finds that the Plaintiffs' claim became unreasonable thereon.

The court provided no further rationale for its decision to award fees.

Read one way, the district court's language suggests that the plaintiffs' action only became unreasonable after they refused to settle the case on the eve of trial. If that were the district court's view, the only relevant litigation costs of the municipality would have been those related to case preparation from the time of the rejection of the settlement demand and the cost of trial. But the district court awarded the municipality $59,787.50 in attorney's fees, the cost it determined to be reasonable for the entire course of the litigation. Hence, we review the attorney's fee award as one that does, in fact, cover the entire course of litigation.

## II.

We review fee awards for abuse of discretion. Lamboy-Ortiz v. Ortiz-Vélez, 630 F.3d 228, 236 (1st Cir. 2010). "[T]hus we will not lightly substitute our judgment for that of the district court, reversing only 'if we are left with a definite and firm conviction that the court below committed a clear error of judgment.'" Id. (quoting Tang v. State of R.I., Dep't of Elderly Affairs, 163 F.3d 7, 13 (1st Cir. 1998) (internal quotation mark omitted)).

## A. Legal Framework

Parties to civil litigation are generally responsible for their own attorney's fees under the so-called "American Rule." However, "[f]or private actions brought under 42 U.S.C. § 1983 and

other specified measures designed to secure civil rights, Congress established an exception to the 'American Rule.'" Sole v. Wyner, 551 U.S. 74, 77 (2007). That exception operates to facilitate "effective access to the judicial process," Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (quoting H.R. Rep. No. 94-1558, at 1 (1976)) (internal quotation marks omitted), by granting federal district courts the discretion to "allow the prevailing party . . . a reasonable attorney's fee as part of the costs," 42 U.S.C. § 1988(b).

It is well established that "an award of fees in favor of a prevailing plaintiff in a civil rights suit is 'the rule, whereas fee-shifting in favor of a prevailing defendant is the exception.'" Lamboy-Ortiz, 630 F.3d at 236 (quoting Casa Marie Hogar Geriatrico, Inc. v. Rivera-Santos, 38 F.3d 615, 618 (1st Cir. 1994)). Indeed, a "prevailing defendant may be awarded fees only 'upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" Id. (quoting Roselló-González v. Acevedo-Vilá, 483 F.3d 1, 6 (1st Cir. 2007)). This standard is, by design, a difficult one to meet. "Congress granted parties the prospect of a reasonable attorney's fee under 42 U.S.C. § 1988 to encourage the prosecution of legitimate civil rights claims; to award fees to prevailing defendants when the history of a case does not justify it undercuts that goal and chills civil rights litigation." Id.

-7-

When determining whether a plaintiff's claims were "frivolous, unreasonable, or without foundation," or whether "the plaintiff continued to litigate after [the claims] clearly became so," Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 422 (1978), the court should not evaluate the reasonableness of the suit based on its ultimate failure:

> [I]t is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation.

Id. at 421-22. We have stated that such "hindsight logic" may be avoided by focusing on the reasonableness of a plaintiff's claim at the time of filing, Lamboy-Ortiz, 630 F.3d at 237, keeping in mind that "[e]ven when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit," Christiansburg Garment, 434 U.S. at 422.

When reviewing the district court's decision to award fees, we too must assess the reasonableness of the suit at the time the complaint was filed. To do so, we must inevitably rely on the record created after the complaint was filed. Although

-8-

determinations about whether to award attorney's fees are generally focused on the claims as they existed at the time the complaint was filed, "fees also may be awarded on rare occasions where 'the plaintiff continued to litigate after [the claims] clearly became [frivolous, unreasonable, or groundless].'" Lamboy-Ortiz, 630 F.3d at 241 (alteration in original) (quoting Christiansburg Garment, 434 U.S. at 422).

## B. Details of Complaint

We recite the allegations of the complaint in some detail because they are so important to the legal analysis that follows. In the complaint, the plaintiffs stated that they are affiliated with Puerto Rico's Popular Democratic Party ("PDP") and alleged that the Mayor and supervisory defendants are affiliated with the New Progressive Party ("NPP"). The plaintiffs claimed that shortly after Barlucea, who is affiliated with the NPP, replaced the previous mayor, who was affiliated with the PDP, they were transferred from their jobs because of their political beliefs and affiliation with the PDP. The plaintiffs claimed that, as a result of the transfers, they were stripped by the Mayor and supervisory defendants of significant responsibilities and forced to endure inferior and unreasonable working conditions in jobs unrelated to their previous positions. The allegations specific to each plaintiff's employment and transfer are as follows:

### 1. Myrta Torres-Santiago

Torres was employed by the municipality as an Assistant Accountant in the Finance Department until the challenged transfer. In the Finance Department, Torres kept financial records, verified order statuses, and prepared buying orders. After Mayor Barlucea replaced the previous mayor, Torres received a letter from his office, dated January 31, 2005, stating that she was being transferred to the Department of Recycling and Environmental Control ("Recycling Department"). Torres alleged that Báez, her Recycling Department supervisor, approved her transfer and, on February 4, 2005, assigned her duties that were inferior to her duties in the Finance Department. Torres also claimed that in the Recycling Department, she had "inferior and unreasonable working conditions," which were created by the Mayor and Báez.

### 2. Migdalia Rodríguez-Rivera

Rodríguez had been employed by the municipality since 2002, and was Manager of Municipal Facilities at the time of the challenged transfer. In that position, Rodríguez prepared an activity calendar for the facilities under her supervision, supervised municipal activities, and ordered materials and equipment. Mayor Barlucea transferred Rodríguez to the municipality's Coliseum Rafael Llull Perez without assigning her any duties. At the Coliseum, Rodríguez worked under Portela, who -

with the Mayor - created for Rodríguez inferior and unreasonable working conditions.

### 3.  José Rivera-del Valle

Prior to the challenged transfer, Rivera was employed by the municipality as an Assistant Accountant in the Finance Department.  There, Rivera registered orders, contracts, and special funds; verified forms; and maintained daily inspections of payments, orders, and cancelled checks. Mayor Barlucea transferred Rivera to the Municipal Cemetery Luz del Gigante to work under Caraballo.  Barlucea did not assign Rivera duties at the time of the transfer.  Rivera alleged that, at the cemetery, he had inferior and unreasonable working conditions that had been created by the Mayor and Caraballo.

## C.  Reasonableness at the Time of Filing

Plaintiffs claim that their transfers, diminutions in duties, and unreasonable working conditions violated the First Amendment, which protects public employees who hold nonpolicymaking positions from adverse personnel decisions rooted in partisan political concerns.  See, e.g., Barry v. Moran, 661 F.3d 696, 703 (1st Cir. 2011).  Essentially, plaintiffs argue that Barlucea used his power as Mayor to move three PDP political activists out of offices in City Hall and deprive them of almost all meaningful responsibilities, and that the supervisory defendants also discriminated by refusing to assign them duties in their new

-11-

positions and providing inferior and unreasonable workplace conditions. To establish a prima facie case of political discrimination under the First Amendment, a plaintiff must establish four elements: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." Méndez-Aponte v. Bonilla, 645 F.3d 60, 64 (1st Cir. 2011) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 13 (1st Cir. 2011)) (internal quotation marks omitted). In order to determine the reasonableness of the plaintiffs' claims, we address the factual support for each element on the basis of the summary judgment record.[2]

---

[2] In the analysis that follows, we rely on the summary judgment record, including exhibits submitted by the parties with their motions for and opposing summary judgment. The district court excluded from consideration "some of the materials submitted by both [parties]" because of the "lack [of] an authenticating affidavit" or the "fail[ure] to indicate whether they stem from discovery materials on file." Given the way the court described its exclusions, we cannot tell which rejected pieces of evidence we may have included in our analysis. However, our inability to make that determination is not important. We consider this evidence only for its relevance to the reasonableness of the plaintiffs' lawsuit at the time it was filed. See Lamboy-Ortiz, 630 F.3d at 238. We do not suggest that the excluded evidence developed through discovery should have been considered at summary judgment. See id. We do not rely on trial evidence because no transcripts from the trial were prepared. Plaintiffs did not appeal the adverse trial determinations. In defending the reasonableness of their claims in this appeal, plaintiffs rely on the summary judgment record.

### 1. Opposing Political Affiliations

As the district court noted in its summary judgment decision, it was uncontested that all of the plaintiffs are affiliated with the PDP and that Mayor Barlucea and Rivera's supervisor, Caraballo, are affiliated with the NPP. Rodríguez's supervisor, Portela, stated in his deposition that although he had been affiliated with the PDP in the past, he supported NPP candidate Barlucea for Mayor and was given a trust position in Barlucea's cabinet. Similarly, Torres's supervisor, Báez, stated in his deposition that although he was affiliated with the PDP in 2000, he did not participate in PDP election activities in 2004 because he had issues with the PDP mayor who preceded Barlucea. Báez said that he was appointed by Barlucea in 2005 to a trust position in Barlucea's cabinet. With regard to Portela and Báez, the plaintiffs could have reasonably inferred from their supervisory trust positions in an NPP administration that their supervisors were members of - or were at least now affiliated with - the opposing party. See Grajales v. P.R. Ports Auth., 682 F.3d 40, 47-48 (1st Cir. 2012) (stating that it was plausible to infer defendants' knowledge of plaintiff's political affiliation where "the plaintiff . . . was named to a prestigious trust position by a PDP hierarch under a PDP administration"). Given the information known to the plaintiffs at the time they filed their lawsuit, there was a reasonable basis for the plaintiffs' belief that they could

successfully satisfy the opposing political affiliation element of their claim.

### 2. Barlucea's and the Supervisory Defendants' Awareness of Plaintiffs' Political Affiliations

In its summary judgment order, the district court summarized the evidence that provided a reasonable basis for the plaintiffs' belief that Barlucea and the supervisory defendants were aware of the plaintiffs' political affiliations:

> It stems from the record that all three Plaintiffs active[ly] and publicly campaigned in favor of the PDP and were polling unit officers or members of electoral colleges. Specifically, it is plaintiff Torres'[s] contention that Barlucea knows her political affiliation because he voted in the electoral college where she worked as a poll watcher. Plaintiff Rodríguez asserts that she and codefendant Portela worked together in the past in political campaigns, and thus, he is aware of her political affiliation. As to co-defendant Barlucea, Rodríguez claims that he knows her political affiliation because of her active campaigning, her work as a poll watcher, and because Adjuntas is a small close-knit community. Plaintiff Rivera purports that Barlucea knows his political affiliation because they used to be neighbors and talked openly about politics. As to co-defendant Caraballo, Rivera asserts that they saw each other at the local state election commission office where they worked for their respective parties during elections.
>
> Moreover, in their opposition, Plaintiffs proffered, by means of deposition testimony, that their political affiliations were well-known within the Municipality of Adjuntas and its municipal employees. Plaintiffs' evidence portrays a relatively small community where most everyone knew who everyone else was and political

-14-

affiliations were common knowledge. In light of all of the foregoing, this Court finds that a reasonable jury could conclude that Defendants knew of Plaintiffs' political affiliations.

We agree with the district court that based on the information known to the plaintiffs at the time they filed their lawsuit, the plaintiffs had a reasonable basis for believing that they could satisfy the awareness element of their claim.

### 3. Adverse Employment Actions

To satisfy the third prong of the political discrimination test, a plaintiff must show that an adverse employment action took place. Actions short of discharge, including a substantial alteration in responsibilities, may satisfy the adverse employment action element. Morales-Vallellanes v. Potter, 605 F.3d 27, 36 (1st Cir. 2010); see also Welch v. Ciampa, 542 F.3d 927, 936 (1st Cir. 2008).

The complaint alleges that "the Municipality of Adjuntas . . . ordered the illegal transfer[s]" and the supervisory defendants "approved the transfer to their departments and assigned duties to the plaintiffs which were inferior to their original duties." It is not contested that Mayor Barlucea ordered the transfers. Plaintiffs presented no evidence that the supervisory defendants had any part in those transfer decisions. Instead, plaintiffs allege that the supervisory defendants, subsequent to those transfers, discriminated against them by subjecting them to

"inferior and unreasonable working conditions," and by implementing policies which resulted in the assignment of inferior duties to the plaintiffs or no work at all.

We first address the transfers ordered by the Mayor and the claims that those transfers were actually demotions to jobs with little or no responsibilities. We then examine the allegations against the individual supervisory defendants.

### a. Barlucea's Transfer Orders

After being transferred by the Mayor, each of the plaintiffs performed fewer and more menial duties. That pattern is unmistakable.

### 1. Myrta Torres-Santiago

Torres claims that there was no accounting work in the Recycling Department and, as a result, she performed no duties pertaining to what she describes as her official function. While many of the duties nominally assigned to Torres after her transfer to the Recycling Department were similar to those that she had performed in the Finance Office, her supervisor, Báez, acknowledged in his deposition that Torres did not perform those duties because they continued to be done by Finance Office employees. Torres also stated that, on numerous occasions, the Mayor's assistant called the Recycling Department and said that, per the Mayor's orders, Torres could not leave the office to get breakfast or to attend municipal events.

## 2. Migdalia Rodríguez-Rivera

Rodríguez stated that during a meeting in January 2005, Barlucea asked Rodríguez what her title was. After hearing her answer, Barlucea told Rodríguez that she could not remain in the Office of Citizens' Affairs. After her transfer to the Coliseum, Rodríguez stated that she had no work and voluntarily resorted to collecting trash. According to Portela, Barlucea told him that Portela would receive Rodríguez's duties list from Claribel Pagán,[3] the Personnel Director in the municipality's Human Resources Department. Portela did not timely receive the list. In a letter dated February 11, 2005, Rodríguez lamented to Barlucea that she had yet to be assigned any duties. Portela stated that he eventually went to Pagán around March 16 and secured Rodríguez's duties list. After that date, Portela stated that Rodríguez "coordinat[ed] and supervis[ed] the conservation and maintenance activities of the Coliseum," including "coordinating the pick up of solid waste." Barlucea acknowledged that prior to Rodríguez's transfer to the Coliseum, he had visited the Coliseum and was aware that there was no desk or office there.

---

[3] Pagán was not a party to this action, although she was listed on the docket as a defendant. The district court denied plaintiffs' motion to amend the complaint to add her as a defendant.

### 3.  José Rivera-del Valle

Rivera stated that his responsibilities were diminished significantly after Barlucea's transfer order.  Despite the numerous tasks described in Rivera's duties memorandum, he and his supervisor Caraballo both stated in their depositions that the only duty Rivera actually performed at the cemetery was keeping a ledger of the burials.

### b.  Supervisory Defendants' Actions

We agree with the district court that the mere fact that the supervisory defendants "approved" the plaintiffs' transfers by accepting the placements is insufficient to show that the supervisory defendants were involved in the transfer decision-making process.  A defendant may not be held liable for political discrimination merely because the defendant supervises the department to which a plaintiff alleging political discrimination is transferred.  See Ayala-Rodríguez v. Rullán, 511 F.3d 232, 236 (1st Cir. 2007).  Rather, "only persons who were directly involved in the wrongdoing may be held liable."  Martinez-Vélez v. Rey-Hernández, 506 F.3d 32, 41 (1st Cir. 2007) (quoting Kostka v. Hogg, 560 F.2d 37, 39 (1st Cir. 1977)).

Plaintiffs' claims against the supervisory defendants go beyond the initial transfer.  They allege that the supervisory defendants abused their positions of authority by creating inferior and unreasonable working conditions and failing to assign the

-18-

plaintiffs proper duties. As such, there are allegations of continuing post-transfer adverse employment actions at the hands of the supervisory defendants.

### 1. Torres and Báez

Báez stated in his deposition that he received a call from Pagán telling him that Torres was going to be sent to the Recycling Department. Báez stated that Pagán gave him the duties list, which he signed and gave to Torres, telling Torres that Pagán "gave me the assignments and duties that you have to perform." Torres stated in her deposition that Báez gave her the list "knowing well that none of those functions would be carried out [in the Recycling Department]."

Torres sent a letter to Mayor Barlucea and Báez saying that the duties assigned to her "cannot be performed and have never been performed at the Recycling Department, but rather in . . . the Finance [Office], and therefore, there is no work to be done." (alteration in deposition transcript). Báez acknowledged receipt of the letter, and stated in his deposition that he had felt it was important to respond to the letter. He just forgot to do so. Báez agreed that many of the listed duties were performed in the Finance Department, he and stated that in the Recycling Department office, "[s]ometimes I have seen [Torres] doing some things, and sometimes I have seen her not doing anything." Despite seeing Torres doing

nothing on numerous occasions, Báez did nothing to change the situation.

Torres also said that the Mayor's office called the Recycling Department numerous times to instruct that Torres could not leave the office to, for example, get breakfast or attend activities such as inaugurations, an apparent change in her working conditions. She stated in her deposition that Báez told one of Torres's co-workers that "by order of the [M]ayor to avoid problems" neither Torres nor the co-worker was permitted to leave the office area.

Under the circumstances described, Torres could have reasonably believed that Báez had discretion to assign her duties that could actually be performed at the Department of Recycling, and he chose not to do it. However, she had no reasonable basis for believing that Báez was responsible for the restrictions on her leaving the office. By her own deposition, she knew that Báez was implementing the Mayor's orders with these restrictions.

### 2. **Rodríguez and Portela**

In a letter to the Mayor dated February 11, 2005, Rodríguez complained that she was forced to work alone, the only telephone was in an isolated area, and she did not have an office, desk, or chair. Rodríguez stated in her deposition that she also made these complaints to Portela. Portela responded to Rodríguez's complaints by letting her use the Coliseum's small ticket booth and

a room behind it that contained a table.[4]  He did not provide a chair.

Rodríguez also stated that she made numerous complaints to Portela about ongoing political and sexual harassment of her by the man responsible for opening the Coliseum door each morning. She said that Portela refused to engage in a conversation on the issue and her complaints went unaddressed.

Also, on approximately four mornings in 2005, Rodríguez had to call Pagán from outside the Coliseum to get someone to unlock it so that Rodríguez could get inside to begin her workday, which, according to Rodríguez, generally consisted of sitting on a bench with nothing to do, or collecting trash.  Although Portela said that Rodríguez never worked alone, Rodríguez's calls to Pagán in Human Resources asking for someone to open the door suggested otherwise.

Under the circumstances described, Rodríguez could have reasonably believed that Portela had discretion to assign her duties that could actually be performed at the Coliseum, and he chose not to do it.  She could also have reasonably believed that he was responsible for the inferior working conditions that she was experiencing, including the ongoing political and sexual harassment by a co-worker.

---

[4] We cannot tell from the record how much time passed between Rodríguez's complaint and Portela's provision of a table.

### 3.  Rivera and Caraballo

Caraballo stated in his deposition that he learned that Rivera was being transferred to the cemetery during a meeting with Pagán, who gave Caraballo a duty sheet and told him to sign it and give it to Rivera.  Although Caraballo said that he read the sheet, he was new to the department at the time, having been there only one month, and he did not know whether the functions listed were carried out at the cemetery and appropriately assigned to Rivera. Rivera stated in his deposition that the list included tasks that could not be done at the cemetery.  There is, however, no evidence that Rivera complained to Caraballo about the diminution of his duties.  Moreover, Rivera stated in his deposition that he had a good working relationship with Caraballo, and that he originally intended only to sue the municipality and not Caraballo.  He was instructed by his attorney, however, that Caraballo should be included in the complaint.  This pro forma inclusion of Caraballo in the complaint simply because he was Rivera's supervisor was unreasonable.  See Tang, 163 F.3d at 14 n.9 (stating that "the plaintiff's reliance on a lawyer's advice is not a complete defense to attorney's fees claims by defendants").

### 4.  Political Affiliation as a Substantial or Motivating Factor for the Adverse Employment Actions

We have often observed that it is rare that a "smoking gun" will be found in political discrimination cases.  Lamboy-

-22-

Ortiz, 630 F.3d at 240. Thus, "circumstantial evidence alone may support a finding of political discrimination. Moreover, the quantum of circumstantial evidence needed to prevail at trial will be considerably greater than that which will provide a plaintiff with reasonable grounds for filing suit." Id. (citation omitted). While mere temporal proximity between a change of administration and an adverse employment action is insufficient to establish discriminatory animus, Ocasio-Hernández, 640 F.3d at 18, it is relevant to whether political affiliation was a substantial or motivating factor in that adverse employment decision, Pequero-Moronta v. Santiago, 464 F.3d 29, 53 (1st Cir. 2006). Also probative of discriminatory animus is "a politically charged employment atmosphere occasioned by [a] major political shift . . . coupled with the fact that plaintiffs and defendants are of competing political persuasions." Ocasio-Hernández, 640 F.3d at 17-18 (quoting Acevedo-Diaz v. Aponte, 1 F.3d 62, 69 (1st Cir. 1993)) (internal quotation mark omitted).

In this case, it is undisputed that each of the plaintiffs was a prominent opponent to Barlucea's candidacy for Mayor of Adjuntas. See Acevedo-Diaz, 1 F.3d at 69 (noting that an "active or prominent role[] in [the party's] political activities" may suggest political animus where "plaintiffs and defendants are of competing political persuasions"). Moreover, as the district court noted in its summary judgment opinion, there was a highly-

-23-

charged political atmosphere "inasmuch as there was a political shift in the Municipality of Adjuntas when Barlucea, a NPP member, followed Roberto Vera Monroig, a PDP member, as Mayor." The temporal proximity between Barlucea's inauguration and the plaintiffs' transfers and subsequent diminution of duties and workplace conditions is undeniable - Barlucea took office in January 2005, and each of the plaintiffs was transferred on January 31, 2005. This evidence was sufficient to establish the reasonable belief of the plaintiffs that their political affiliation was a substantial or motivating factor in the decision of the Mayor to transfer them to a job with diminished or no responsibilities, under inferior working conditions.

The evidence relating to the political animus of the supervisory defendants Báez and Portela includes the same background facts, supplemented by the adverse employment actions that Torres and Rodríguez experienced at the hands of Báez and Portela in the form of little or no work, and Rodríguez experienced under Portela's watch in the form of inferior working conditions. To be sure, it would have been difficult for Torres and Rodríguez to know at the time that they filed their complaint whether Báez and Portela were simply carrying out the Mayor's orders, or whether Báez and Portela had a free hand in the work assignments and Portela in the inferior working conditions, and hence were imposing these adverse employment actions out of their own political animus.

-24-

Given the timing of the municipal elections, the charged political atmosphere in the municipality, and the experiences of Torres and Rodríguez while under the supervision of Báez and Portela, the plaintiffs could at least have reasonably believed at the time that they filed their lawsuit that Báez and Portela, like the Mayor, were motivated by their own political animus in depriving Torres and Rodríguez of meaningful work and that Portela was similarly motivated in imposing inferior working conditions on Rodríguez. See Gomez v. Rivera Rodriguez, 344 F.3d 103, 122 (1st Cir. 2003) (stating that political discrimination claims "require[] proof that the actor . . . intended to discriminate"); see also Rivera-Torres v. Ortiz-Velez, 341 F.3d 86, 97 (1st Cir. 2003) (stating that "subjective intent is an essential element of political discrimination"). Whether they could substantiate that reasonable belief through the discovery process would be another matter.

## D.  The Municipality's Arguments

We have concluded that there was a reasonable basis for the plaintiffs' claims, except for Torres's inferior working conditions claim against Báez and Rivera's claims against Caraballo. In arguing to the contrary, the municipality asserts that the failure of the plaintiffs' claims against the supervisory defendants to survive summary judgment demonstrates that the claims as a whole were frivolous. As noted, the court granted summary judgment for Báez based on its determination that there was no

genuine issue of material fact as to whether Báez was a member of an opposing party. Báez had not - unlike Portela - supported Barlucea's mayoral candidacy. The district court granted summary judgment to Portela and Caraballo based on the plaintiffs' failure to generate a genuine issue of material fact on the role of the supervisors in the "acts complained of by the [p]laintiffs, [including] the transfers, the absence of duties, the lack of office equipment or the lack of authorization to leave the office or attend municipal activities," which it concluded were "the result of Barlucea's acts and/or orders."

The district court's grant of summary judgment, however, does not mean that the diminished duties claim against Báez or the diminished duties and inferior working conditions claims against Portela were unreasonable at the outset of the litigation. The standards governing summary judgment and reasonableness for purposes of attorney's fees under § 1988 are different; "[s]imply because the district court granted the defendants' motion for summary judgment does not mean that the plaintiffs' action was frivolous" or unreasonable. O'Neal v. DeKalb County, 850 F.2d 653, 658 (11th Cir. 1988). Báez's inclusion in the Mayor's cabinet, even if he was not a member of the NPP, suggested that he now had a political affiliation opposed to the plaintiffs'. Báez and Portela were actively involved, at the very least, in the implementation of policies that significantly reduced the

-26-

responsibilities of Torres and Rodríguez and, in the case of Portela, subjected Rodríguez to inferior working conditions that continued even after direct complaints to Portela. Whether the supervisory defendants' involvement was simply the implementation of the policies of the Mayor by loyal lieutenants or involved those defendants' own decisions based on their own political animus was an appropriate subject for discovery. See Gomez, 344 F.3d at 122 (stating that political discrimination claims "require[] proof that the actor . . . intended to discriminate"). After discovery was complete, the district court concluded that there was not enough evidence in the summary judgment record to let the case against the supervisory defendants go forward. We do not fault the district court's judgment on that score. There is no necessary incompatibility between the district court's decision to grant summary judgment to Báez and Portela and our conclusion that, at the outset of this litigation, there was a reasonable basis for the political discrimination claims against Báez (in part) and Portela.

The denial of summary judgment for the municipality and Mayor, while not determinative of the reasonableness of the claims against them, was highly probative of the reasonableness of those claims, and the district court was wrong to conclude otherwise:

> In the run of cases, . . . most claims that would warrant an award of attorney's fees under section 1988's relatively stringent standards — those that are truly "frivolous, unreasonable, or without foundation," Christiansburg Garment, 434 U.S. at 421 — will

not survive summary judgment. To overcome a summary judgment motion, a plaintiff must introduce evidence that creates a "genuine issue of material fact" as to the substance of her claims, i.e., one that "could be resolved in favor of either party" and "has the potential of affecting the outcome of the case." Vera v. McHugh, 622 F.3d 17, 26 (1st Cir. 2010) (internal quotation marks omitted). The plaintiff's ability to make such a showing surely reflects on the question of whether the claim was, at the time, clearly frivolous, unreasonable, or without foundation.

Lamboy-Ortiz, 630 F.3d at 242. Here the plaintiffs did generate genuine issues of material fact in their case against the Mayor that were appropriately resolved at trial. The jury found that Torres and Rodríguez had failed to prove by a preponderance of the evidence that Barlucea had knowledge of their political affiliation. Rivera established that element, but the jury determined that he had failed to prove that his political affiliation was a substantial or motivating factor in the employment actions against him. The jury was entitled to make those judgments. But there was abundant evidence in the summary judgment record that would have supported different conclusions.

## E. Reasonableness of Plaintiffs' Decision to Continue to Trial After Settlement Offer

In its fee decision, the district court awarded fees based at least partially on the plaintiffs' refusal to accept what the district court characterized as a "sound settlement offer."[5]

---

[5] See supra Part I.

The district court concluded that "the Plaintiffs' claim became unreasonable thereon." The court did not explain, however, why it concluded that the plaintiffs' rejection of the settlement offer or any other factors made further pursuit of their claims unreasonable. Indeed, the defendants did not argue that the court should consider the failure to settle as a factor in assessing whether the standards of § 1988(b) were met. Rather, the district court sua sponte injected that factor into its decision.

As the Supreme Court explained in Christiansburg Garment, 431 U.S. at 422, "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." The mere failure to accept even a "sound settlement offer" does not convert a reasonable claim into a frivolous one, and neither the municipality nor the district court explained why the reasonable claims that we have described had become unreasonable or groundless by the time trial approached. See Casa Marie Hogar Geriatrico, 38 F.3d at 618 (stating that a prevailing defendant bears the burden of "establish[ing] that the plaintiffs' suit was totally unfounded, frivolous, or otherwise unreasonable"). Thus, on this record, we can only conclude that the district court's award of attorney's fees in the amount stated constituted "a clear error of judgment." Lamboy-Ortiz, 630 F.3d at

236 (quoting Tang, 163 F.3d at 13 (internal quotation mark omitted)).

## III.

For the reasons stated, we have concluded that there was a reasonable basis for the plaintiffs' claims against the municipality, Mayor Barlucea, Báez (in part), and Portela when filed, and there remained a reasonable basis for the claims against the municipality and Mayor Barlucea throughout the trial process. We have also concluded that the inferior working conditions claim against Báez and the claims against Caraballo were unreasonable when filed. Hence, the district court abused its discretion in awarding attorney's fees to the municipality other than those that would not have been incurred but for the inclusion of those unreasonable claims.

In cases such as this, where there are both frivolous and non-frivolous claims, the award must include "only . . . fees the prevailing defendant would not have paid but for the frivolous claim." Efron v. Mora Dev. Corp., 675 F.3d 45, 47 (1st Cir. 2012); see also Fox v. Vice, 131 S. Ct. 2205, 2215 (2011) ("Section 1988 allows a defendant to recover reasonable attorney's fees incurred because of, but only because of, a frivolous claim."). Any fees that the defendant would have nevertheless incurred to defend against non-frivolous claims may not be awarded. Fox, 131 S. Ct. at 2215. Thus, fees incurred to defend the municipality - even if

the work also benefitted Báez and Caraballo - are unrecoverable. The district court may in its discretion award to defendants the fees, if any, that are attributable <u>solely</u> to the additional costs associated with the unreasonable claims against Báez and Caraballo.

We vacate the fee award and remand for a determination of any award consistent with this decision.

<u>So ordered.</u>  <u>Each party shall bear its own costs</u>.