# United States Court of Appeals
## For the First Circuit

No. 12-2357

MANUEL A. GARCÍA-GONZÁLEZ,

Plaintiff, Appellant,

v.

JUAN C. PUIG-MORALES,

Defendant, Appellee,

RAMÓN L. CRUZ-COLÓN,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Torruella, Lipez, and Kayatta,
Circuit Judges.

Jorge Martínez-Luciano, with whom Pedro E. Ortiz-Álvarez and Pedro E. Ortiz-Álvarez, LLC, were on brief for appellant.
Michelle Camacho-Nieves, Assistant Solicitor General, Department of Justice, with whom Margarita Mercado-Echegaray, Solicitor General, were on brief for appellee Puig-Morales.

August 1, 2014

**TORRUELLA, Circuit Judge.** This case involves due process and political discrimination claims related to the procurement of public contracts by independent contractors. Plaintiff-Appellant Manuel A. García-González ("García") alleges First and Fourteenth Amendment violations and seeks compensatory and punitive damages under 42 U.S.C. § 1983 over the rescission of a bid award for a potential, but unexecuted, insurance brokerage contract with the Puerto Rico government (the "Commonwealth" or the "government"). Defendant-Appellee Juan C. Puig-Morales ("Puig") was Puerto Rico's Secretary of the Treasury at the time of these events.

The district court granted summary judgment in favor of Puig on García's Fourteenth Amendment claim, holding that García had no constitutionally protected property interest in the initial bid award. Subsequently, the district court also granted Puig's motion for summary judgment on García's First Amendment claim.

For the reasons set forth below, we affirm the district court's grant of summary judgment on García's Fourteenth Amendment due process claim, and we reverse the grant of summary judgment on his First Amendment claim for political discrimination. We remand that claim for further proceedings consistent with this opinion.

## I. Background

### A. Factual Background

Over an eight-year period, from April 28, 2001, through May 30, 2009, García, a licensed insurance broker, held annual

contracts with the Puerto Rico Department of the Treasury (the "Treasury") for the acquisition of insurance policies for various government agencies. García received sizable commissions for brokering these insurance contracts.

On October 1, 2008, García entered into a one-year professional services contract with the Treasury to acquire insurance policies for the Commonwealth's Public Buildings Authority, the Americas Port Authority, the Administration of General Services, and the "Portal del Futuro" Public Corporation. Pursuant to the agreement signed by García and the Treasury, the professional services contract could be terminated by either party upon thirty days' written notice.

García self-identifies as a member of the Popular Democratic Party ("PDP"). For all but the final five months of the eight-year period during which García held contracts with the Treasury, the executive branch of the Puerto Rico government was controlled by governors from the PDP.

On November 4, 2008, however, the incumbent PDP governor lost a general election to Luis Fortuño, a gubernatorial candidate from the opposing New Progressive Party ("NPP"). Governor Fortuño and his Treasury Secretary, Puig, were both sworn into their new offices on January 2, 2009.

Less than three months later, in a letter dated March 20, 2009, Puig notified García that his existing brokerage contract --

which was scheduled to expire on September 30, 2009 -- would instead be terminated early, with an effective end date of May 30, 2009. The letter further announced that Puig's office would receive new proposals for insurance brokerage contracts between March 25, 2009, and April 17, 2009. On March 26, 2009, the Treasury published a Request for Proposals ("RFP") regarding the provision of professional services for the acquisition of insurance policies. The RFP document contained the terms and conditions that were to govern the adjudication proceedings for selecting insurance brokers. The RFP provided, among other things, that:

(1) "[t]he Secretary [of the Treasury] fully reserves the right to revise this RFP, in part or whole";

(2) the Treasury's Agency for Public Insurance ("API") "reserves the absolute right to reject any or all proposals submitted and to limit selections to a determined number of all the best qualified Producer[s] deemed sufficient to handle the amount of work involved";

(3) "[a]s part of the process," API "will evaluate prior perform[ance] of the Producer, if any, as well as their qualifications and experience reflected on their proposals";

(4) the government "will not be liable in any way whatsoever for any costs or expenses incurred by any person in the preparation of proposals in response to this RFP, nor for the

-4-

presentation of its proposal and/or participation in any discussions or negotiations";

(5) the selection of contractors "shall be final, except for the right of the Secretary and API to terminate any designation for reasonable cause";

(6) selected providers will be informed "about their selection and what next steps are to be taken in relation to such selection";

(7) "[a]fter the evaluation takes place and the Secretary makes the corresponding decisions, the selected proposals will be subject to the normal Government's procedural approvals for professional services contracts";

(8) "[t]he Producer will be compensated with commissions as stated on the Professional Services Contract"; and

(9) "API retains the right to terminate any contracted Producer at any time due to unacceptable performance."

García submitted his proposal on April 15, 2009, within the deadline prescribed by the RFP. His proposal was received by API on April 17, 2009. On May 15, 2009, the Treasury issued an "Adjudication Notification" letter to García. The letter informed him that his proposal was "favorably considered" by the evaluating board to "continue the process of finalizing the contract," before he could ultimately sign a professional services contract for the procurement of insurance policies. The accounts contemplated for

-5-

García's putative contract were for the purchase of insurance policies for the following governmental instrumentalities: (a) the Corrections Administration, (b) the Administration of Juvenile Institutions, (c) the Department of Education, and (d) the Puerto Rico Technological Institute. These policies accounted for a total of $7,881,350 in estimated insurance premiums, and García asserts that the brokerage contract would have yielded him approximately $450,000 in commissions. The Adjudication Notification requested that García sign and return it; it further outlined the subsequent steps for the ultimate execution of a final professional services contract between the parties.

García proceeded to sign the Adjudication Notification, accepting all of the adjudicated accounts. On May 18, 2009, the Treasury received García's timely acceptance of the adjudication, along with the corresponding documents required prior to the execution of the brokerage contract, pursuant to the specifications of the Adjudication Notification. A final contract, however, was not executed by the parties.

On May 28, 2009, García received a Treasury letter rescinding the Adjudication Notification, explaining that "[t]he processes carried out produced countless errors in issuing [his] letter, as well as other letters that were also issued." The letter also stated that García would soon receive a corrected adjudication letter, or that he would be notified of a new date for

-6-

the distribution of corrected letters.  No further details were provided regarding the nature of the "countless errors" or whether there were procedures available to contest the Treasury's determinations.

García never received a corrected adjudication letter. Instead, García was presented with a contract for accounts different from those that he had been originally awarded.  These new accounts represented significantly lower insurance policy premiums, and correspondingly, much lower commissions.  Under the proposed new contract, García's expected commissions were around $15,000 -- between approximately three and four percent of the expected commissions for the accounts in his original award. García refused to sign the contract.

## B.  Procedural History

On May 26, 2010, García filed a complaint against Treasury Secretary Puig and Ramón L. Cruz-Colón ("Cruz"), who was then serving as the Insurance Commissioner.  The complaint sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for alleged political discrimination and due process violations. García also sought compensatory damages under Puerto Rico law.

On February 9, 2011, García filed a motion for partial summary judgment in connection with his due process claim, alleging that he had "a legitimate claim of entitlement to the signing of the relevant contracts" and that he "was entitled to a

pre-deprivation proceeding before [Puig] materially changed the terms of the adjudication."

Puig, in turn, opposed García's motion for partial summary judgment on April 1, 2011, claiming that government agencies may revoke the award of a contract at any time prior to its execution. Puig further claimed that García's expectations did not amount to a vested property interest in the signing of the brokerage contract, and that the Parratt-Hudson doctrine barred relief under the Due Process Clause because García could have availed himself of an adequate post-deprivation remedy, but failed to do so.[1] In his opposition to summary judgment, Puig requested the dismissal of García's due process claim.

On June 30, 2011, García filed a notice voluntarily dismissing all claims against Cruz and requesting that those claims be dismissed with prejudice.

On September 29, 2011, the district court denied García's Motion for Partial Summary Judgment and granted summary judgment in favor of Puig on García's Fourteenth Amendment claim. The district

---

[1] The Parratt-Hudson doctrine establishes that "a deprivation of a constitutionally protected property interest caused by a state employee's random, unauthorized conduct does not give rise to a § 1983 procedural due process claim, unless the State fails to provide an adequate postdeprivation remedy." Zinermon v. Burch, 494 U.S. 113, 115 (1990) (citing Hudson v. Palmer, 468 U.S. 517 (1984), and Parratt v. Taylor, 451 U.S. 527 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); see also San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 687 F.3d 465, 478-81 (1st Cir. 2012) (outlining the Parratt-Hudson doctrine).

-8-

court further gave Puig sixty days to file a dispositive motion as to García's First Amendment claim. On September 30, 2011, García filed a motion for reconsideration, which Puig opposed. On December 2, 2011, Puig filed a motion for summary judgment as to García's First Amendment claim.

On September 27, 2012, the district court denied García's motion for reconsideration and granted Puig's motion for summary judgment on the First Amendment claim. The district court dismissed García's federal causes of action with prejudice and dismissed his claims under Puerto Rico law without prejudice. This appeal followed.

## II. Discussion

We review a district court's grant of summary judgment de novo, crediting the evidence favorable to the nonmoving party and drawing all reasonable inferences in favor of the nonmovant. See, e.g., Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013). Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Newman v. Advanced Tech. Innovation Corp., 749 F.3d 33, 36

(1st Cir. 2014) (quoting One Nat'l Bank v. Antonellis, 80 F.3d 606, 608 (1st Cir. 1996)).

A genuine issue of material fact "must be built on a solid foundation -- a foundation constructed from materials of evidentiary quality." Nieves-Romero v. United States, 715 F.3d 375, 378 (1st Cir. 2013). "'[C]onclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative' will not suffice to ward off a properly supported summary judgment motion." Id. (alteration in original) (quoting Rogan v. City of Bos., 267 F.3d 24, 27 (1st Cir. 2001)).

A party may assert that a fact can, or cannot, be genuinely disputed by citing to the presence or absence of facts found in "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). When an affidavit or declaration is used for these purposes, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Id. 56(c)(4). Relatedly, a party may object that the material cited "cannot be presented in a form that would be admissible in evidence," id. 56(c)(2), and "[a] witness may testify to a matter only if evidence is introduced

sufficient to support a finding that the witness has personal knowledge of the matter," Fed. R. Evid. 602.

Here, García seeks compensatory and punitive damages under 42 U.S.C. § 1983 for alleged constitutional violations under the First and Fourteenth Amendments. Section 1983 establishes a civil cause of action for the deprivation of constitutional rights. See 42 U.S.C. § 1983. In order to prevail on a § 1983 claim, a plaintiff must demonstrate: "(i) that the conduct complained of has been committed under color of state law, and (ii) that the alleged conduct worked a denial of rights secured by the Constitution or laws of the United States." Cepero-Rivera v. Fagundo, 414 F.3d 124, 129 (1st Cir. 2005) (quoting Romero-Barceló v. Hernández-Agosto, 75 F.3d 23, 32 (1st Cir. 1996)). There must be a causal connection between the defendant's conduct and the alleged deprivation: "only those individuals who participated in the conduct that deprived the plaintiff of his rights can be held liable." Id.

We begin with García's due process claim under the Fourteenth Amendment and then turn to his political discrimination claim under the First Amendment.

**A. García's Due Process Claim**

García argues that the Adjudication Notification letter "created a legitimate expectancy" that he "would be engaged to provide insurance brokerage services to the government."

Therefore, in his view, he "was entitled to some type of hearing prior to being deprived of the adjudication to which he was selected."

García concedes that, as a general matter, a contractual relationship -- without more -- does not create a constitutionally protected property interest that can give rise to damages under § 1983. Yet he nonetheless argues that a letter merely offering to begin negotiations to establish a contractual relationship does, in fact, establish such a protected interest. As further explained below, based on clear precedent, we reject this illogical argument.

### 1. Procedural Due Process

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Accordingly, "certain substantive rights -- life, liberty, and property -- cannot be deprived except pursuant to constitutionally adequate procedures." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). "'[T]he root requirement' of the Due Process Clause" is that an individual must be provided notice and an opportunity to be heard prior to being "'deprived of any significant property interest.'" Id. at 542 (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971)).

In evaluating a procedural due process claim under the Fourteenth Amendment, we must determine "whether [the plaintiff]

-12-

was deprived of a protected interest, and, if so, what process was his due." Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982). Accordingly, "[t]o establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.'" González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (second alteration in original) (quoting Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006)); see also Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 11 (1st Cir. 2013) ("To establish a procedural due process violation, a plaintiff must show that (1) it was deprived of a protected property interest, and (2) the procedures attendant to that deprivation were constitutionally inadequate."). Therefore, if García has failed to establish that he had a protected property interest in the rescinded Adjudication Notification, his due process claim must fail. See Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 11 (1st Cir. 2005) ("Because the plaintiffs identify no constitutionally protected property interest, it is unnecessary to delve any deeper into the section 1983 inquiry.").

**2. Property Interests and Bids for Government Contracts**

We have stated that, to demonstrate a constitutionally protected property interest, a plaintiff must identify a

"legitimate claim of entitlement" to the property in question and must show more than an abstract need, desire, or unilateral expectation of that property.  Id. at 8 (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)); see also id. at 9 ("[D]ashed hopes of receiving future government work, without more, cannot yield a constitutionally protected property interest."); Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 8 (1st Cir. 2005) (same).  We have also made clear that "[a]ward procedures are not assigned to establish private entitlements to public contracts but to produce the best possible contracts for the government."  Smith & Wesson v. United States, 782 F.2d 1074, 1081 (1st Cir. 1986).

Additionally, we have repeatedly held that "a simple breach of contract does not amount to an unconstitutional deprivation of property," and that "the existence of a state contract, simpliciter, does not confer upon the contracting parties a constitutionally protected property interest."  Redondo-Borges, 421 F.3d at 10.  We have explained that this rule "makes eminently good sense," as "[t]o hold otherwise would run the risk of transmogrifying virtually every dispute involving an alleged breach of contract by a state or a state agency into a constitutional case."  Id.  In Redondo-Borges, we also held that the plaintiffs' interest in a revoked bid award did "not rise to the level of a constitutionally protected property interest."  Id.  In so holding,

-14-

we cautioned that to reach the opposite result "would lead us down a slippery slope to an untenable result: the constitutionalization of all contract law in cases in which a state actor is a party." Id. at 11.

While a government contract does not per se create a protected property interest, there may be certain "special circumstances" that can justify an exception to this general rule. See id. at 10.  The Third Circuit, for example, has identified two types of contracts that can create protected property rights: (1) where the contract confers a protected status upon the plaintiff, or (2) where the contract provides that the government entity may only terminate the contract "for cause."  Linan-Faye Constr. Co. v. Hous. Auth. of Camden, 49 F.3d 915, 932 (3d Cir. 1995), cited in Redondo-Borges, 421 F.3d at 10.

Although the RFP is not a contract, García nevertheless hangs his hopes on this second exception.  He notes that the RFP specifies that once the insurance brokers were selected, such selections would only be set aside "for reasonable cause."  In his view, this "reasonable cause" language gave him a constitutionally protected property interest in the contracts for which he bid, and for which the Adjudication Notification stated that he had been "favorably considered."  García argues that "the RFP created a legitimate expectancy that, if selected, a proponent would be

-15-

engaged to provide insurance brokerage services to the government."
We disagree.

### 3.   The Relevant Documents

Admittedly, the "Introduction" section of the RFP does state -- albeit in a subsection titled "Inquiries" -- that the selections of insurance brokers "shall be final, except for the right of the Secretary and API [the Agency for Public Insurance] to terminate any designation for reasonable cause."  However, the RFP also provides that Puig "fully reserves the right to revise this RFP, in part or whole."  The RFP further states that the government "reserves the absolute right to reject any or all proposals submitted."  There is no express language temporally limiting this "absolute right" of rejection to the period prior to adjudication or selection.

Moreover, the RFP makes clear that the initial selections of providers will then be subject to the government's "normal . . . procedural approvals" before the finalization of any contractual relationship.  Neither the RFP nor the Adjudication Notification makes any promise or guarantee regarding the outcome of this approval process.  In a subsection titled "Goals of the Program," the RFP also states that "[t]he Secretary reserves the right to limit individual Producer participation in the program based on criteria such as its capacity to handle a particular amount of business, its number of qualified professional[s], the size of its

-16-

operation or any other valid criteria."  The foregoing language reinforces the government's significant discretion in the bidding and contracting process, such that provisionally successful bidders do not have a guaranteed right to profits from their putative contracts.

The RFP's statement that the government retains the "absolute right" to reject any proposal -- together with the RFP's explanation that successful bidders are required to provide additional documents, submit to contract approval processes, and engage in contract negotiations -- undermines García's argument that selected bidders have a "legitimate expectancy" of being "engaged to provide insurance brokerage services to the government" that is sufficient to engender constitutional protection.  In a similar case, the Seventh Circuit held that under Illinois law, the express reservation of the right to reject any and all bids precludes a finding of a protected property interest.  See Kim Constr. Co. v. Bd. of Trs. of Mundelein, 14 F.3d 1243, 1246 (7th Cir. 1994) ("[W]hen a state entity's advertisement for bids contains explicit language reserving its right to reject any and all bids, no bidder can claim a constitutionally protected property interest in being awarded the contract.").  Similarly, following Supreme Court precedent, we have recognized that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  Clukey v. Town of Camden, 717 F.3d 52, 56

-17-

(1st Cir. 2013) (quoting <u>Town of Castle Rock, Colo.</u> v. <u>Gonzales</u>, 545 U.S. 748, 756 (2005)) (internal quotation marks omitted).

The language of the Adjudication Notification further weakens García's position. To be sure, this letter does inform García that he had "been <u>favorably</u> considered." However, in the next paragraph, the letter also specifies that García or his representative must sign the letter "[i]n order to continue with [the] process of formalizing the contract." The letter continues to describe additional procedures and requirements necessary before a contract could be executed between the parties. Nowhere in the Adjudication Notification is there any suggestion that the government is obligated to execute and approve a final contract with García unless it has "reasonable cause" to cease negotiations or reject the contract.

Read together, the RFP and the Adjudication Notification establish that García was not granted a right to a final professional services contract and its attendant commissions, but rather was provisionally selected merely to begin contract negotiations and to take part in a standard approval process with multiple requirements prior to signing a contract with the government. As García readily concedes, no such contract was ever executed. Nor does García argue that the RFP and the Adjudication Notification established a contractual relationship -- such as a "contract to execute a contract" -- between him and the government.

-18-

Had a final contract been executed, García further concedes that, under our precedent, he would not have a protected property interest in that contract. Accepting this concession, we cannot see how the government's non-binding offer to begin contract negotiations and the "normal" contract-approval process granted García a constitutionally protected property interest.

García's putative economic damages, he alleges, consist of lost commissions amounting to approximately $450,000. The Adjudication Notification specifies the accounts for which García was "favorably considered" and their corresponding premiums, but it does not provide any information regarding commissions for those accounts. And the RFP clearly states that a broker's commissions are to be set by the final professional services contract. As no contract was executed, García's hoped-for commissions and profits were merely speculative. The language of the RFP also contemplates further "discussions or negotiations" between the parties prior to signing a contract. For these reasons, García's "claim of entitlement," Roth, 408 U.S. at 577, to any profits or commissions would be stronger if a final professional services contract had been executed by the parties. Given García's concession that he would have no constitutionally protected entitlement to the commissions under such a contract, it would defy logic to nonetheless embrace his argument that the Constitution protects his weaker claim to those commissions by means of a unilateral offer to

begin negotiations and a contract-approval process.  Cf. Jones v. City of Boston, 752 F.3d 38, 56 (1st Cir. 2014) (holding that a plaintiff was not entitled to due process because "[i]t is clear . . . that the [property] interest created by a conditional job offer can be no stronger than that created by an unconditional job offer, and that this interest in turn rises no higher than that possessed by someone who has recently begun work in the position").[2]

García's argument thus fails as a matter of logic.  As explained below, it also necessarily fails under governing Puerto Rico law.

### 4.  Property Interests as Defined by Puerto Rico Law

The property interests protected by the Fourteenth Amendment "are defined by state law."  Harron v. Town of Franklin, 660 F.3d 531, 537 (1st Cir. 2011).  The Supreme Court of Puerto

---

[2]  In Jones, one plaintiff received a conditional job offer via a letter that read: "If you successfully pass the medical examination and hair drug testing components of the screening process, you will be tendered a final offer of employment."  Id.  If the plaintiff had been hired, she would have been subject to "a six-month probationary period during which [she would] not have the protection from termination without just cause afforded to tenured employees."  Id.  In Massachusetts, such a probationary employee with a job terminable with or without cause does not a have a protected property interest in continued employment.  Id.  We reasoned that "even had [the plaintiff] begun to work, she would have had no cognizable property interest in continued employment during the entirety of her probationary period."  Id.  Therefore, we concluded that "[a] fortiori, having not begun work, [the plaintiff] also had no cognizable property interest based on the job offer alone."  Id.

-20-

Rico has explicitly held that a Puerto Rico government "agency has the right to revoke the award of a contract at any time before the corresponding contract is entered into, since a contract is not binding on an agency until [the] formal contract containing all the legal requirements for the performance of the work is executed in writing." Cancel v. Municipio de San Juan, 101 P.R. Dec. 296, 300-01, 1 P.R. Offic. Trans. 416, 422 (1973) (quoting Justiniano v. Commonwealth, 100 P.R. Dec. 334 (1971)); see also Rocket Learning, Inc. v. Rivera-Sánchez, 851 F. Supp. 2d 384, 395 (D.P.R. 2012), aff'd on other grounds, 715 F.3d 1 (1st Cir. 2013) ("[U]nder Puerto Rico law, a bidder for a contract with the government does not acquire a property interest until the contract has been formalized.").

García identifies no Puerto Rico law -- not a single case or statute -- demonstrating that the RFP and the Adjudication Notification gave him a protected property interest. Because the parties here did not execute in writing a "formal contract containing all the legal requirements for the performance of the work," Puerto Rico law makes clear that García did not have a protected property interest in the Adjudication Notification. See Cancel, 1 P.R. Offic. Trans. at 422; Rocket Learning, 851 F. Supp. 2d at 395. Therefore, given his failure to establish that he had a protected property interest in the rescinded Adjudication Notification, García's due process claim must fail. See

-21-

Redondo-Borges, 421 F.3d at 10 (recognizing that "[a] recurrent theme in this court's jurisprudence" supported a holding that the plaintiffs' interest in a rescinded bid award "d[id] not rise to the level of a constitutionally protected property interest"); id. at 11 (holding that the plaintiffs' § 1983 claim failed due to the lack of a constitutionally protected property interest).[3]

**B.  García's First Amendment Claim for Political Discrimination**

The second issue before us is whether there is a genuine issue of material fact precluding affirmance of summary judgment in favor of Puig as to his liability under 42 U.S.C. § 1983 for political discrimination against García.  García alleges that Puig, Secretary of the Treasury in an NPP administration, rescinded his bid award because of García's political affiliation with an opposing political party, the PDP.  Based on the cumulative weight of the limited evidence put forth by García, we cannot say that there is no genuine issue of material fact on his First Amendment claim.  Therefore, as further explained below, the grant of summary judgment in favor of Puig on this issue requires reversal.

---

[3]  Given our conclusion that García has failed to demonstrate a constitutionally protected property interest, we need not address Puig's argument that García's due process claim would be barred under the Parratt-Hudson doctrine based on Puig's assertion that Puerto Rico law provides adequate post-deprivation remedies.  See, e.g., Gardner v. City of Balt. Mayor & City Council, 969 F.2d 63, 69 n.1 (4th Cir. 1992).

-22-

## 1.    Political Discrimination in Public Contracting

"Section 1983 is the conventional vehicle through which relief is sought for claims of political discrimination by state actors."  Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 54 (1st Cir. 2013).   "For this purpose, Puerto Rico is the functional equivalent of a state."  Id.

"The right to associate with the political party of one's choice is an integral part of the basic constitutional freedom to associate with others for the common advancement of political beliefs and ideas protected by the First Amendment."  Carrasquillo v. Puerto Rico ex rel. Justice Dep't, 494 F.3d 1, 4 (1st Cir. 2007) (citing Kusper v. Pontikes, 414 U.S. 51, 56-57 (1973)).   The First Amendment therefore bars government officials from taking adverse employment action on the basis of a person's political affiliation, "unless political affiliation is an appropriate requirement for the position."  Méndez–Aponte v. Bonilla, 645 F.3d 60, 64 (1st Cir. 2011)); see also Welch v. Ciampa, 542 F.3d 927, 938 (1st Cir. 2008).[4]   The Supreme Court has held that First Amendment protections also extend to independent contractors with preexisting commercial relationships with the government, "where [the]

---

[4]   Puig does not argue that the insurance broker independent contractor position sought by García is a policymaking position or a position for which "political affiliation is an appropriate requirement." See Méndez–Aponte, 645 F.3d at 64; see also Foote v. Town of Bedford, 642 F.3d 80, 83 (1st Cir. 2011).  Thus, we need not consider whether this exception applies here.

government retaliates against a contractor, or a regular provider of services, for the exercise of rights of political association or the expression of political allegiance." O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 715 (1996); id. at 726 ("We decline to draw a line excluding independent contractors from the First Amendment safeguards of political association afforded to employees."); see also Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr, 518 U.S. 668, 681-84 (1996) (expressing some skepticism of the practices of patronage and political bias in government contracting); id. at 685 (concluding that "independent contractors do enjoy some First Amendment protection").

To date, we have not found it necessary to rule on whether such protections extend to first-time bidders or applicants for new government contracts. See Centro Médico, 406 F.3d at 9; Prisma Zona Exploratoria de P.R., Inc. v. Calderón, 310 F.3d 1, 7 (1st Cir. 2002); see also Umbehr, 518 U.S. at 685 ("Because Umbehr's suit concerns the termination of a pre-existing commercial relationship with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship."). Nor does this case present such an opportunity.

Although García is protesting his failed bid for an unexecuted government contract, the record also shows that García held various annual contracts with the Treasury for several years

prior to 2008.  Indeed, the district court found that García had a pattern of annual contracting with the Treasury during the eight-year period beginning on April 28, 2001, and ending on May 30, 2009.  This period was interrupted only by a two-month gap in 2003.  On that basis, the district court concluded that García had a preexisting commercial relationship with the Treasury.

Furthermore, it is undisputed that García and the Treasury entered into a one-year professional services contract on October 1, 2008 -- a contract which the department terminated immediately prior to the RFP and the Adjudication Notification at issue.  In the written notice the Treasury sent to García informing him that his existing contract would be cancelled, the department also specified that if he was "interested in continuing to participate in the Program," he could apply in writing by responding to the RFP.  Although previously we have "take[n] no view" on whether "the protections recognized in Umbehr . . . extend to unsolicited bids for new government contracts," Centro Médico, 406 F.3d at 10 (emphasis added), this case involves a request for proposals rather than an "unsolicited" bid for a new contract.  In essence, García was solicited to reapply for an existing contract -- a contract similar to the annual contracts he held every year since 2001.

We therefore find that, under these particular circumstances, García had a preexisting commercial relationship

with the Commonwealth and is thus subject to First Amendment protections against retaliation for his political affiliation. See O'Hare Truck, 518 U.S. at 715; Umbehr, 518 U.S. at 685; Prisma Zona, 610 F.3d at 7; Centro Médico, 406 F.3d at 9; cf. Rutan v. Republican Party of Ill., 497 U.S. 62, 75 (1990) ("[P]romotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees.").

As an additional preliminary matter, we pause to note that the district court clearly erred by applying the balancing test articulated in Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill., 391 U.S. 563 (1968), instead of the principles established by the line of cases following Elrod v. Burns, 427 U.S. 347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980). The Pickering balancing test applies to free speech cases, "where a government employer takes adverse action on account of an employee or service provider's right of free speech." O'Hare Truck, 518 U.S. at 719. Because García's First Amendment claim is premised solely on discrimination for his political affiliation, and does not involve factual allegations of unconstitutional infringement upon his freedom of speech,[5] the Pickering test is

_____

[5]  García's complaint captions his "First Cause of Action" as "Freedom of Speech/Association" and alleges that the defendants' actions "violate plaintiff's rights to freedom of speech and freedom of association." However, for this cause of action, the specific factual allegations in the complaint pertain solely to

inapplicable.  See id.; see also Acevedo-Delgado v. Rivera, 292 F.3d 37, 45 (1st Cir. 2002) ("Pickering is inapposite to this case, which does not involve an asserted state interest that allegedly was compromised by an employee's statements.").  Having disposed of these threshold matters, we now turn to examine the elements of García's prima facie claim for political discrimination, beginning with a summary of the relevant evidence.

### 2.  Evidence Relevant to García's First Amendment Claim

At the outset of this inquiry, we note that several facts on which García relies, including which bidders gained and lost contracts, are likely inadmissible hearsay.  However, Puig did not object to these statements below, and evidentiary objections not

discrimination based on political affiliation.  The complaint states that García "belongs to a political party that espouses philosophies and ideas different to those of the defendants, something that was known to defendants when they decided to take adverse employment actions against him, moved and/or motivated by plaintiff's affiliation to the PDP."

García's opposition to summary judgment and briefs also make no specific factual allegations regarding any protected speech or violations of his freedom of speech, but instead address only a claim of discrimination based on political affiliation.  Moreover, in his appellate brief, García states that "[i]t is plain from the face of the complaint and from every single document filed by the parties thereafter that plaintiff's claim for violation of his First Amendment rights stems from a political discrimination theory of liability under the so-called Elrod/Branti rubric . . . ."

For these reasons, we see no reason to construe García's "First Cause of Action" as including two causes of action so as to find that he pleaded a freedom-of-speech claim in addition to his freedom-of-association claim.  See, e.g., EBI, Inc. v. Gator Indus., Inc., 807 F.2d 1, 4-5 (1st Cir. 1986) (finding that the plaintiff had not asserted a claim for breach of contract when the complaint's breach-of-contract caption was "totally unsupported by any factual allegations which would signal" such a claim).

raised before the district court are deemed waived on appeal. See, e.g., Dorpan, S.L. v. Hotel Meliá, Inc., 728 F.3d 55, 67 n.14 (1st Cir. 2013). We further note that several pieces of evidence proffered by García are, in isolation, of questionable value. Nonetheless, in the aggregate, the cumulative weight of García's evidence -- together with the reasonable inferences drawn therefrom -- is sufficient to defeat summary judgment.

In support of his theory of the case as to political discrimination, García offers the following evidence: (1) his deposition testimony stating that he spoke to multiple contractors affiliated with the PDP who also had their initial bid awards rescinded; (2) his deposition testimony that he personally knew of NPP-affiliated brokers who were awarded the contracts originally adjudicated to him; (3) a copy of a contract awarded to an alleged NPP-affiliated broker; (4) a table outlining the Treasury's numerical evaluation of the fifty-four independent contractors who submitted proposals through the RFP; (5) a certification from the Treasury denying that it has any documents concerning the alleged errors involved with the original Adjudication Notification; and (6) Puig's deposition testimony (in another case) that he had the authority to make the final determinations regarding the awarding of the Treasury contracts. Each category of evidence is examined in more detail below.

First, when asked at his deposition whether he knew any of the other contractors who had received the letter rescinding the original adjudication, García replied, "I know all of them. After thirty-five years in this business, I think I know all of them, except the new ones . . . ." He testified that, after receiving the letter informing him of the "countless errors" in the Adjudication Notification, he reached out to several other insurance brokers he knew to be affiliated with the PDP, including: Benjamín Hernández, Consuelo Revuelta, Roberto Fonseca, and Tito Casellas. He later saw three of these brokers at the Treasury Department on May 26, 2009, and he confirmed with them that they had received the letter. Together, they surmised that there was an improper "external motivation" for the rescission of the adjudications -- namely, their affiliation with the PDP.

Second, when asked about his allegation that all the contracts that originally had been adjudicated to him were later awarded to NPP insurance brokers, García explained in his deposition that he personally knew of five different NPP-affiliated contractors that were awarded such contracts: Lone Star Producers, Inc. ("Lone Star"), Christiansen Insurance, Inc., Jorge Urrutia Vallés, Ikon Group, and Luis Bonnet. García stated that "[a]ll I know is that they were on May 15, all of them were in the adjudication and what happened after May 15, was that all that were not [NPP] people, [they were] stricken out . . . significantly the

amount of accounts that were given, and those accounts were distributed among those [NPP-affiliated brokers] who already had accounts."  In context, this deposition testimony implies that García -- based on his personal relationships built over the course of his thirty-five years of experience in the industry -- knew the political affiliations of most of the insurance brokers involved in the bidding process.  It further implies that he knew that the reallocation of the rescinded bid awards favored brokers affiliated with the NPP over those affiliated with the PDP.

Third, García provided a copy of the contract awarded to Lone Star, one of the NPP-affiliated contractors he identified in his deposition.  The contract was awarded on May 25, 2009, for a total amount of $1,363,813.02; the signing parties were Andrés Guillemard for Lone Star and Secretary Puig for the government.  We need not rely solely on García's deposition testimony for the proposition that Lone Star is affiliated with the NPP.  Instead, García points us to political discrimination cases filed by Lone Star and its principals, in which they self-identified as NPP members and were awarded $4.7 million in § 1983 damages for political discrimination by the preceding PDP administrations. See, e.g., Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 510 (1st Cir. 2009) (stating that plaintiffs-appellees Andrés Guillemard–Ginorio and his wife, María Noble–Fernández, each fifty-percent owners of Lone Star, are both "prominent members of the

NPP, having contributed substantial time and financial support to NPP candidates").  Thus, there is some evidence that an NPP-affiliated broker was awarded a high-value contract in the wake of the rescinded Adjudication Notification.

Fourth, García points to a table detailing the numerical evaluation scores given to all fifty-four contractors who participated in the RFP; he asserts that the higher numerical scores were given to the most qualified brokers.  The PDP-affiliated contractors identified by García were given the following scores: (1) Consuelo Revuelta - 57.5; (2) Tito Casellas & Co. - 52.5; (3) García himself - 47.5; and (4) Benjamín Hernández - 45.5.  By comparison, the contractors García identified as affiliated with the NPP received the following scores: (1) Luis Bonnet - 56; (2) Lone Star - 46; (3) Nicolás Muñoz - 41; (4) Christiansen Insurance - 40; (5) Ikon Group - 36;  and (6) Jorge Urrutia Vallés - 31.  All four PDP providers in the former group had higher scores than all but two NPP providers in the latter group.  Nonetheless, García asserts that all of the PDP contractors were "victims of the purported 'errors' in the original adjudication" and had their contract awards reduced, despite having higher scores than several NPP providers.[6]

_____

[6]   This table, García's explanation of it, and his allegations concerning a subset of the producers listed therein are far from complete, clear, and conclusive.  Nonetheless, the table provides some support and corroboration for García's assertions in his deposition testimony, particularly in light of the Treasury's

Fifth, García introduced a certification from the Treasury, sent in response to his subpoena, stating that the department has no documents or records concerning: (1) any investigations into irregularities in the original adjudication of bids submitted in response to the April 2009 RFP; (2) the letters notifying all bidders of problems or irregularities with the initial adjudications; (3) any measures taken by the Treasury to correct the alleged errors in the adjudication process; or (4) Secretary Puig's second adjudication of contracts under the RFP. To date, the Treasury has offered no explanation of the alleged "countless errors" that prompted the rescission of García's original Adjudication Notification.

Finally, García provided an excerpt of the transcript of a deposition of Puig taken in a different case on August 19, 2011. In that deposition, Puig testified that he was responsible for the selection of independent contractors for the Treasury, and that his "authority is that of having to make a determination as to who is going to be granted certain professional services contracts and who is not."

### 3. The Elements of a Political Discrimination Claim

A plaintiff seeking to establish a prima facie claim of political discrimination under the First Amendment must show four

failure to provide additional documents in response to García's subpoena.

elements: "'(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action.'" Torres-Santiago v. Municipality of Adjuntas, 693 F.3d 230, 236 (1st Cir. 2012) (quoting Méndez–Aponte, 645 F.3d at 64).[7]

On de novo review, if there is no genuine issue of fact on the summary judgment record with respect to any of these elements, then García's First Amendment claim must fail. See Fed. R. Civ. P. 56(a). For purposes of summary judgment, we consider only "materials of evidentiary quality." Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011). Accordingly, "both affidavits and

_____

[7] After a plaintiff has established a prima facie case for political discrimination by showing these four elements, the burden shifts to the defendant to "'prove by a preponderance of the evidence that the adverse action would have been taken regardless of any discriminatory political motivation.'" Cepero-Rivera, 414 F.3d at 132 (quoting LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996)); see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Barry v. Moran, 661 F.3d 696, 703-04 (1st Cir. 2011). At this stage of the litigation, however, Puig has advanced no evidence or argument that the adverse action would have been taken absent any discriminatory motive; indeed, Puig has offered no explanation of the "countless errors" in the adjudication process that allegedly prompted rescission of the original award. Accordingly, for purposes of the current appeal, we need not consider the burden shift and we may confine our inquiry to the elements of the prima facie case. See, e.g., Jones, 752 F.3d at 54-55 (declining to consider, in the first instance, a post-burden-shift defense not yet considered by the trial court); id. at 55 ("Federal appellate courts have discretion in deciding whether to take up questions not considered below, but they generally should not do so.").

deposition testimony are effective in opposing summary judgment only when they are given on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or deponent (as the case may be) is competent to testify about the matter in question."  Id.

With these principles in mind, we address each element of García's prima facie case in turn.[8]

### a.  Opposing Political Affiliations

To survive summary judgment, García must first demonstrate that there is a genuine issue of fact as to whether he and Puig have opposing political affiliations.  See Torres-Santiago, 693 F.3d at 236.  He has done so.  First, García has provided deposition testimony that he is affiliated with the PDP.  The nature of his own political affiliation is certainly

---

[8]  We note that, on appeal, Puig has squarely presented challenges to García's proof on only the first two elements: (1) whether the parties have opposing political affiliations, and (2) whether Puig was aware of García's political affiliation.  Puig has thus arguably waived any argument concerning the final two elements. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (internal citations omitted)).  Nonetheless, as we may affirm the district court's "entry of summary judgment on any basis made manifest by the record," Demelo v. U.S. Bank Nat'l Ass'n, 727 F.3d 117, 121 (1st Cir. 2013), we will examine the summary judgment evidence with respect to all four elements of García's political discrimination claim.

within García's personal knowledge and could serve as proper trial testimony.

Therefore, for Puig to demonstrate that there is no genuine issue of material fact as to the parties' opposing political affiliations, he would have to establish that there is no basis in the record for reasonably concluding that Puig is a member of an opposing political party. This Puig has failed to do, as "[t]he NPP and PDP are opposing political parties in Puerto Rico," Guillemard-Ginorio, 585 F.3d at 511, and the facts of this case permit a reasonable inference that Puig is affiliated with the NPP.

We find Puig's arguments to the contrary unavailing. Admittedly, García does not personally know Puig and has presented no documentary evidence that Puig belongs to the NPP. And, in an unsworn "Statement Under Penalty of Perjury" signed on December 5, 2011 (the "Unsworn Statement"), Puig declared that he was not personally affiliated with the NPP. In Puig's view, this is sufficient to demonstrate that "the uncontested facts establish that Plaintiff and Defendant did not belong to opposing political parties."

Puig argues that "the only reason" for García's belief that Puig is a member of the NPP consists of an assumption grounded upon Puig's nomination and service as the Secretary of the Treasury under Governor Fortuño's NPP administration. This assumption, however, is sufficient for present purposes. Reviewing the grant

of summary judgment, we must resolve all reasonable inferences from the evidence in the light most favorable to García. See Shafmaster, 707 F.3d at 135. No party disputes that Governor Fortuño was a member of the NPP or that Puig, as Secretary of the Treasury, was a high-ranking official in an NPP administration. And "[i]t is no secret that political leaders most often choose political allies to fill important policymaking positions." Grajales v. P.R. Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012). It is therefore reasonable to infer that Puig was affiliated with the NPP during the relevant period. See id. at 47-48 (reasoning that "a plausible inference can be drawn that the plaintiff, who was named to a prestigious trust position by a PDP hierarch under a PDP administration, was a member of the PDP," and remarking that a court is not required "to blind itself to what is obvious").

### b. Puig's Awareness of García's Affiliation

To establish the second element of a political discrimination claim, García would have to show that Puig was aware of García's political affiliation. See Torres-Santiago, 693 F.3d at 236. Puig argues that there is no genuine issue of fact regarding this element, because (1) there is no evidence showing that Puig was aware that García was a member of the PDP, and (2) Puig's Unsworn Statement conclusively resolves the issue in Puig's favor.

-36-

Indeed, there is some support for Puig's position. It is uncontested that García has never run for or held public office as a PDP candidate and that he has not worked for the campaign of a PDP candidate. He has not appeared on television or radio in support of the PDP. Furthermore, in his Unsworn Statement, Puig declared that: (1) he did not know who García was; (2) he did not know of García's political affiliation; (3) he had not seen García participate in political activities for the PDP; and (4) he had no knowledge of García being an active member of the PDP.

García, for his part, testified in his deposition that he was, in fact, affiliated with the PDP. He elaborated that he publicly displayed his PDP affiliation by talking with his friends and attending political rallies, meetings, gatherings, and cocktail events for the 2008 election. He stated that he contributed financially to the campaigns of several PDP candidates, including the then-incumbent PDP governor who lost to Governor Fortuño in the 2008 election.

In his deposition, García further testified that he and Cruz -- the Insurance Commissioner serving under Puig at the time -- were friends and had worked together for several years. García testified that Cruz "absolutely" knew his political "color" because they had "talk[ed] about it." Puig, in his statement of uncontested material facts, agrees that García "has had an excellent relationship with the Insurance Commissioner Ramón L.

Cruz-Colón and considers him to be his friend." Puig does not dispute that he and Cruz worked together in the Fortuño administration during the relevant period, or that Cruz participated in the RFP adjudication process at issue. Puig declared, however, that Cruz had never informed him of García's political affiliation.

Viewing these facts in the light most favorable to García, and drawing all reasonable inferences in his favor, see Shafmaster, 707 F.3d at 135, we conclude that there was a genuine issue of material fact as to whether Puig was aware of García's political affiliation, see Torres-Santiago, 693 F.3d at 236. In his deposition, García testified that he made no secret of his political affiliation and that he actively supported PDP candidates with financial contributions and his presence at campaign rallies and other events. Given García's friendship with Cruz, their working relationship, and García's testimony that they talked about politics and Cruz knew that he was a member of the PDP, it is reasonable to conclude that Cruz knew of García's political affiliation.

Accepting as true García's testimony that high-scoring insurance brokers associated with the PDP had their contract awards reduced while the awards for lower-scoring brokers associated with the NPP were either unchanged or increased, the factfinder could infer that whoever was making the decision must have been doing so

based largely on party affiliation. Puig does not dispute on appeal that he was the decision maker who was ultimately responsible for the rescission of the initial awards and their subsequent reallocation.[9] Nor has he provided any explanation for the apparent correlation between results and partisan affiliation, or for the supposed "errors" that led to the initial award to García. Given that apparent correlation between results and partisan affiliation, and the unexplained reasons for the changes, a reasonable jury could infer that Puig likely learned of García's political affiliation, an inference that is all the more plausible because Puig had a ready source for that knowledge: Cruz.

For all these reasons, there is a genuine issue of fact as to whether Puig knew of García's political affiliation. Answering this question calls for "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

---

[9] Similarly, we note that Puig has waived any argument that he was not personally involved in the decision to rescind García's bid award. See, e.g., United States v. Dellosantos, 649 F.3d 109, 126 n.18 (1st Cir. 2011) (finding an appellate argument waived due to the government-appellee's "perfunctory treatment" of a case and "lack of developed argumentation"). Moreover, on this summary judgment record, any such argument would fail. García put forth evidence of Puig's personal involvement, including that the RFP's terms provide that Puig was responsible for selecting the insurance brokers to receive contracts, that Puig gave deposition testimony in another case stating that he chose the insurance company providers, and that Puig himself signed the letter terminating García's 2008-2009 contract early. Under these circumstances, such evidence is sufficient to establish a genuine issue of material fact as to whether Puig personally "participated in the conduct" that allegedly deprived García of his rights. See Cepero-Rivera, 414 F.3d at 129.

inferences from the facts" -- all tasks for the jury, not the judge.  <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); see also <u>Rodríguez</u> v. <u>Municipality of San Juan</u>, 659 F.3d 168, 175 (1st Cir. 2011).[10]

### c.  Adverse Action

With respect to the third element of a prima facie political discrimination claim, García would have to prove that an adverse action occurred.  See <u>Torres-Santiago</u>, 693 F.3d at 236.  In order to show an adverse action, García need not show a right to a denied government benefit.  The fact that a plaintiff has "no legal entitlement" to a valuable government benefit is "immaterial" to such a First Amendment claim.  <u>Rutan</u>, 497 U.S. at 72 (citing <u>Perry</u> v. <u>Sindermann</u>, 408 U.S. 593, 596-98 (1972)).  Rather, "[t]he First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate."  <u>Rutan</u>, 497 U.S. at 76.

We need not linger long upon this third element of the analysis.  Puig does not seriously contest that no adverse action occurred.  Nor could he.  Through his deposition testimony and the

---

[10]  We also note that even if Puig is telling the truth and did not personally know García's political affiliation, he could still be liable if he told Cruz to rescind awards to PDP-affiliated bidders and that instruction resulted in the revocation of García's award.

various letters he received from the Treasury, García has put forth evidence that he suffered an adverse action.

First, García has provided the letter from Puig notifying him of the early termination of his 2008-2009 contract. García has also averred that he stood to profit by approximately $450,000 in commissions from the contracts originally awarded in the rescinded Adjudication Notification. He has further provided deposition testimony to the fact that the substitute contracts offered by the Treasury would result in commissions of approximately $15,000 -- less than four percent of the expected commissions for his original award. These facts -- the early termination of García's existing contract, the rescission of the Adjudication Notification, and the significant reduction in commissions from his original bid award to the final contracts offered him -- together can be considered to constitute an adverse action. Puig has offered no argument to the contrary.

### d. Causation

Finally, in order to meet the fourth element for a prima facie political discrimination claim, García must show that his political affiliation with the PDP was a substantial or motivating factor for the adverse action. See Torres-Santiago, 693 F.3d at 236; see also Vázquez v. López Rosario, 134 F.3d 28, 36 (1st Cir. 1998); LaRou, 98 F.3d at 661.

-41-

While "unsupported and speculative assertions regarding political discrimination will not be enough to survive summary judgment," Vázquez, 134 F.3d at 36, we have also made clear that "one rarely finds 'smoking gun' evidence in a political discrimination case," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 17 (1st Cir. 2011) (quoting Lamboy-Ortiz v. Ortiz-Vélez, 630 F.3d 228, 240 (1st Cir. 2010)), and that "circumstantial evidence must, at times, suffice," id.

Considering all of the evidence on the summary judgment record, we find that García has presented evidence sufficient to establish a genuine issue of fact as to causation. Indeed, García's evidence presents a credible narrative of a paradigmatic political discrimination case. He had an eight-year tenure as an independent contractor for the Puerto Rico government under PDP administrations, only to have his existing contract terminated early, less than three months into a new NPP administration. He was then awarded a lucrative set of new contracts in the Adjudication Notification, only to have that award rescinded on the basis of "countless" -- but unspecified and as yet unsubstantiated -- errors. Ultimately, he was offered contracts for drastically lower amounts: less than four percent of his original award. He offers some evidence that PDP-affiliated brokers had their awards reduced, while the awards of NPP-affiliated brokers were either unchanged or increased.

-42-

To date, the government has never explained the nature of the alleged errors prompting the rescission of the original award. Puig's refusal to provide any explanation regarding the "countless errors" leading to the adverse action provides some circumstantial evidence of causation.  See id. (providing that circumstantial evidence may be sufficient in a political discrimination case). Moreover, "temporal proximity between a change of administration and an adverse employment action," as happened here, "is relevant to whether political affiliation was a substantial or motivating factor in that adverse employment decision." Torres-Santiago, 693 F.3d at 240; see also Grajales, 682 F.3d at 50 ("[T]he close temporal proximity between the regime change and the [adverse action], coupled with the absence of any legitimate reason for much of the offending conduct, permits a plausible inference . . . that political animus was a motivating factor behind the [conduct]."). And a "politically charged employment atmosphere" resulting from a major shift in power from one political party to another, together with evidence that a plaintiff and defendant are from opposing parties, may be probative of discriminatory animus. Torres-Santiago, 693 F.3d at 240 (quoting Ocasio–Hernández, 640 F.3d at 17-18).

Viewing the facts in the light most favorable to García, and drawing all reasonable inferences therefrom, see Shafmaster, 707 F.3d at 135, we cannot say -- with respect to the final element

of causation -- that García's position is based merely on "conclusory allegations" or "unsupported speculation," see Rogan, 267 F.3d at 27. Rather, we conclude that there is a genuine issue of material fact as to whether García's political affiliation was a substantial or motivating factor for the adverse action. See Torres-Santiago, 693 F.3d at 236.

### 4. Summary

While the summary judgment record here is relatively sparse, making this a close case, we find that García has met his burden of demonstrating a genuine issue of material fact on the prima facie elements of his political discrimination claim. See Montfort-Rodríguez v. Rey-Hernández, 504 F.3d 221, 222 (1st Cir. 2007) ("Although the record is meager and the case is therefore close, we conclude that appellants met their burden to generate a genuine issue of material fact on the elements of their claim."). The individually weak pieces of evidence relied upon by García are nonetheless, in the aggregate, sufficient to defeat summary judgment. See González-de-Blasini v. Family Dep't, 377 F.3d 81, 86 (1st Cir. 2007) (recognizing that a prima facie political discrimination case may be built on circumstantial evidence if a plaintiff has shown "'the specific facts necessary to take the asserted claim out of the realm of speculative, general

allegations'" (quoting Kauffman v. P.R. Tel. Co., 841 F.2d 1169, 1173 n.5 (1st Cir. 1988))).[11]

## III. Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment on García's Fourteenth Amendment claim, and we reverse the grant of summary judgment on his First Amendment claim. We therefore remand García's political discrimination claim for further proceedings consistent with this opinion.

**AFFIRMED IN PART, AND REVERSED IN PART.** Each party shall bear its own costs.

---

[11] As a final matter, we note that Puig makes a half-hearted attempt to raise a qualified-immunity defense with respect to García's First Amendment claim. Puig's brief states "there is no need to enter into an in depth analysis of the qualified immunity defense regarding the political discrimination claim because there is no evidence on the record that shows the existence of a constitutional violation." The two-sentence "argument" that follows is really no argument at all, but instead is a merely conclusory assertion that Puig is entitled to qualified immunity. We have consistently held that such lackluster arguments will be disregarded on appeal. See, e.g., United States v. Delgado–Marrero, 744 F.3d 167, 203 (1st Cir. 2014) (stating that the court may ignore "conclusory allegations" and "bare assertions" in a party's brief).